**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ASSOCIATED MACHINES, Inc., Respondent.**

**No. 12280.**

United States Court of Appeals, Sixth Circuit.

Jan. 31, 1955.

Jerome Brooks, Washington, D. C., George J. Bott, David P. Findling, A. Norman Somers, Elizabeth W. Weston, Nancy M. Sherman, Washington, D. C., on brief, for petitioner.

Walter F. Probst, Jr., and Frank L. Gallucci, Highland Park, Mich., Probst, Gallucci & O'Malley, Highland Park, Mich., on brief, for respondent.

Before SIMONS, Chief Judge, and ALLEN and MILLER, Circuit Judges.

SIMONS, Chief Judge.

The Board seeks a decree for the enforcement of an order issued against the respondent on February 17, 1954, after proceedings under § 10(b) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 160(b). The order requires the respondent to cease and desist from dominating or interfering with the administration of Associated Machines, Inc. Committee or the formation or administration of any other labor organization, and to take certain affirmative steps to implement it.

The respondent challenges the petition on two main grounds, (1) that the Committee was not a labor organization, within the meaning of the Act, (2) that it neither sponsored, dominated nor supported the Committee. It also charges certain procedural errors, and, generally, that the order is not supported by substantial evidence. It also urges that the controversy has become moot by compliance with terms of the order subsequent to its issue.

The Board held that the respondent dominated and interfered with the formation and administration of the Committee in violation of § 8(a) (2) and (1) of the Act, 29 U.S.C.A. § 158(a) (1, 2).

It affirmed the intermediate report of the trial examiner who found that in April and May of 1953 there was discussion among employees of the respondent, in respect to organization by the United Steel Workers of America, C.I.O., and the International Brotherhood of Electrical Workers, A.F. of L., although there had been no open organizing campaign by either organization. On May 23, 1953, Twiss, the general manager of respondent, called a meeting of all of its employees to be held on May 26th. All employees of the three shifts except two attended. There, Twiss presided and suggested to the employees that they elect a Committee of four to represent them. He outlined their term of office and proposed that the Committee should meet with the company on the 15th and the last day of the month, for as long as this was agreeable to a majority. Grievances and working conditions were discussed and settled at the first meeting and at later meetings held in Twiss' office, on June 15, July 1, July 15 and August 20. The Committee members were compensated for their time at overtime rates. Twiss presided at all meetings, the minutes were taken by his secretary, by her transcribed, and copies given to each member of the Committee.

The trial examiner, on the basis of this evidence, found that the respondent had interfered with, sponsored and dominated, the formation and administration of the Committee, that the effect of its interference with the Committee and its continued recognition of it as a bargaining representative of its employees constituted a continuing obstacle to the free exercise by its employees of their right to self organization and to bargain collectively through representatives of their own choosing. He recommended that the respondent withdraw all recognition from the Committee for the purpose of dealing with it concerning grievances and other labor disputes and to completely disestablish it as a representative of the employees. He also recommended that the respondent cease and desist from engaging in like or related conduct or interfering with any other labor organizations of the employees' own choosing.

The respondent denies that the Committee was a labor organization, within the meaning of the Act. It points out that Twiss wanted to get together with his employees to listen to their recommendations and suggestions as to how to improve operation and, at the same time, discuss any grievances that they might have. The company was new and had no history of opposition to unions. The topics discussed at the Committee meetings consisted almost entirely of production problems, plant efficiency, new equipment, and other problems of mutual interest and the minutes of the meetings indicate that there were few, if any, topics discussed that were either grievances or subject to collective bargaining, that it was never understood by either employer or the Committee that its function was the discussion of wages, and neither regarded the Committee as a labor organization or union. No financial aid was given or offered by the company to or accepted by the Committee. No dues were collected from the employees and no collective bargaining agreement entered into.

The testimony of Twiss, explaining the purpose of the organization, was to the effect that he had told the employees that as they were not represented they should elect a Committee to represent them, so that he could listen to their recommendations and suggestions as to how to improve operations, and, at the same time, discuss any grievances that they might have, that they should feel free, at any time, to stop him in the plant and discuss anything with him that they might have on their minds. His testimony as to the purpose of the organization was corroborated by a number of members of the Committee and is nowhere disputed in the record.

The trial examiner found that there was no merit to the contention that the Committee was not a labor organization. He based his decision solely upon the definition contained in § 2(5) of the Act,

61 Stat. 136, 29 U.S.C.A. § 152(5), and upon the observation of Twiss that the meetings might consider grievances. The cited section reads: "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." We consider also, in this connection, the proviso in § 8(a) (2) which reads: "Provided, That subject to rules and regulations made and published by the Board, pursuant to § 6, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay" and also the first proviso of § 9(a) 29 U.S.C.A. § 159(a), which reads: "that any individual employee or group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect:"

This leads us to a consideration of the meaning of the term "grievances" in § 2(5) together with the gloss put upon such term by the proviso in § 9(a). In Hughes Tool Co. v. N. L. R. B., 5 Cir., 147 F.2d 69, 72, 158 A.L.R. 1165, Judge Sibley reasoned, in considering the Wagner Act, 29 U.S.C.A. § 151 et seq., that "* * * it is plain that collective bargaining, in respect to rates of pay, wages, hours of employment and other conditions of employment which will fix for the future the rules of the employment for everyone in the unit, is distinguished from 'grievances,' which are usually the claims of individuals or small groups that their rights under the collective bargain have not been respected." See Note to the Hughes case in 158 A.L.R. 1174.

Construing the Railway Labor Act of 1934, 45 U.S.C.A. § 151 et seq., in Elgin, J. & E. Railway Co. v. Burley, 325 U.S. 711, at page 722, 65 S.Ct. 1282, at page 1290, 89 L.Ed. 1886, the Supreme Court pointed out the distinction between requirements for the prompt and orderly settlement of disputes concerning rates of pay, rules or working conditions and those growing out of grievances. "The first relates to disputes over the formation of collective agreements or efforts to secure them. * * * They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." "In general the difference is between what are regarded traditionally as the major and the minor disputes of the railway labor world. The former present the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid. Because they more often involve those consequences and because they seek to create rather than to enforce contractural rights, they have been left for settlement entirely to the processes of non-compulsory adjustment. The so-called minor disputes, on the other hand, involving grievances, affect the smaller differences which inevitably appear in the carrying out of major agreements and policies or arise incidentally in the course of an employment. ·They represent specific maladjustments of a detailed or individual quality. They seldom produce strikes, though in exaggerated instances they may do so. Because of their comparatively minor character and the general improbability of their causing interruption of peaceful relation and of traffic, the 1934 Act sets them apart from the major disputes and provides for very different treatment."

█ In the popular concept of the term "grievances," it may perhaps be considered to refer to all complaints by an employee against his employer and so includes most of the objectives of collective bargaining. It would seem, however, that in labor legislation it has, to

some extent, acquired a limited meaning as a term of art, and, doubtless, Mr. Justice Rutledge in the Elgin case had in mind the basic concept upon which the constitutionality of the Wagner Act was adjudicated in N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S. Ct. 615, 81 L.Ed. 893, and companion cases, namely, the effect of strikes upon interstate commerce. It becomes necessary, therefore, to consider in what sense the term "grievances" is used in § 2(5) of the Act. It would seem to be clear from its association with "labor disputes, wages, rates of pay, hours of employment, or conditions of work" that it refers to major disputes in the labor field, to collective rather than individual or group complaints, and to chart the future of the employer-employee relationship rather than to correct the past or existing status of that relationship. So, the maxim *Ejusdem Generis* and the broader rule of *Noscitur A Sociis* bids us compare the meaning of "grievances" in the declared and uncontradicted purpose of the appellant in the formation of the Committee. There is found no association of the term with the major objectives of labor organizations in collective bargaining. It travels in different company.

This view is supported by use of the term "grievances" in the § 9(a) Proviso and by the statement of Representative Hartley in House Conference Report No. 510 on H.R. 3020, 80th Congress, 1st Session, p. 45, wherein he stated: "Section 8(a) (3) of the Amended Labor Act in the House bill provided that nothing in the Act was to be construed as prohibiting an employer from forming or maintaining a Committee of employees and discussing with it matters of mutual interest, if the employees did not have a bargaining representative. This provision is omitted from the conference agreement since the Act, by its terms, permits individual employees, and groups of employees, to meet with the employer, and § 9(a) of the conference agreement permits employers to answer their grievances."

■ The view we take of the term "grievances" in this discussion is consistent with that developed in Hoover Motor Express Co., Inc. v. Teamsters, etc., 6 Cir., 217 F.2d 49; N. L. R. B. v. Pennsylvania Greyhound Lines, 303 U. S. 261, 269, 58 S.Ct. 571, 82 L.Ed. 831, is not contra since the company union there formed was organized for the purpose of "securing for them (employees) satisfactory adjustment of all controversial matters" even though it functioned mainly to settle individual grievances. In N. L. R. B. v. General Shoe Corporation, 6 Cir., 192 F.2d 504, the advisory Committee of employees considered wages, rates of pay, hours of employment and conditions of work, and in N. L. R. B. v. Sharples Chemicals, 6 Cir., 209 F. 2d 645, there was substantially equal breadth of purpose. In the present case, such discussion as was had relating to working conditions involved individual rather than collective complaints and the request of the Committee for a parking lot, not available on company property, involved no aspect of "working conditions."

■ It is our conclusion that the Associated Machines, Inc. Committee is not a labor organization, within the meaning of the Act. It, therefore, becomes unnecessary to discuss or rule upon other issues, although it may be appropriate to say that the controversy did not become moot by the post-decision disestablishment of the Committee by the appellant, N. L. R. B. v. Mexia Textile Mills, Inc., 339 U.S. 563, 70 S.Ct. 826, 94 L.Ed. 1067; N. L. R. B. v. Pool Mfg. Co., 339 U.S. 577, 70 S.Ct. 830, 94 L.Ed. 1077; N. L. R. B. v. Toledo Desk & Fixture Co., 6 Cir., 158 F.2d 426.

Enforcement denied.

Judge MILLER is of the opinion that the order should be enforced. Sec. 152 (5), Title 29, U.S.C.A.; N. L. R. B. v. General Shoe Corp., 6 Cir., 192 F.2d 504; N. L. R. B. v. Sharples Chemicals, 6 Cir., 209 F.2d 645.