**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**WALTON MANUFACTURING COM-
PANY, Respondent.**

No. 18285.

United States Court of Appeals
Fifth Circuit.

Jan. 6, 1961.

Melvin Pollack, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick Manoli, Associate Gen. Counsel, Stuart Rothman, Gen. Counsel, Russell Specter, Atty., N. L. R. B., Washington, D. C., for petitioner.

Robert T. Thompson, Alexander E. Wilson, Jr., Wilson, Branch & Barwick, J. Frank Ogletree, Jr., Atlanta, Ga., for respondent.

Before JONES, Circuit Judge, and HOOPER and JOHNSON, District Judges.

JONES, Circuit Judge.

This case is a sequel to N. L. R. B. v. Walton Manufacturing Co., 5 Cir., 286

F.2d 16. In the prior case it was shown that Violet Ewing was an employee of the Respondent. She was laid off in January, 1958, and the Board held that she and eight others were selected for the lay-off, because of their union activities. This Court concluded that General Counsel had not established that the lay-off of Mrs. Ewing was unlawful. Prior to the hearing in the earlier case the Respondent had recalled Mrs. Ewing and she was then working for it. During the hearing before the Examiner on the earlier case Mrs. Ewing was called as a witness by the Board's General Counsel. On the day following Mrs. Ewing was told that Morris Scharff, a representative of the Respondent, wanted to see her in the room where the hearing was had. The Examiner heard both the testimony of Mrs. Ewing and the testimony of Morris Scharff as to what transpired. Mrs. Ewing testified:

"Yes, this man [Morris Scharff]; and he first told me that he was sorry for me the day before because when I went on the stand I looked like I was going to cry, which I might have been, and made the statement that—he said that I knew that he didn't say if the Union come in that he would close the doors, and I didn't make that statement. I told him that I didn't, and I repeated that I had said that Myrtle [Myrtle Ewing, a sister-in-law of Violet Ewing and a supervisor of respondent] had said that if—he didn't care who the girl was or how good an operator she was, if he found out that she had joined the Union, he'd fire her. I did make that remark, and I told him that I had told the truth and he said, well, Myrtle had talked to him that morning and I seems very unhappy and he thought maybe that I'd like to change my statement. I told him no, that what I had said the day before was true and I didn't want to change it, and he said, 'Well, then, what you said yesterday still stands.' I said 'Yes' and he said 'Well, go back to work, then.' So I

left the courtroom and went back to work."

The version of Morris Scharff was thus stated in his testimony:

"Well, she [Myrtle Ewing] told me that Violet Ewing and she had had a conversation that morning and that Violet seems as though she was sorry for what she said, and that gave me the impression that perhaps she didn't testify truthfully. A little later on that morning, when I went to the courthouse, I told Mr. Thompson [counsel for Respondent] about that. He seems to have the same impression, and asked me to get Violet Ewing to come over to the courtroom and speak to her to find out whether or not she had testified untruthfully. She came over, and at a recess during the trial, I went in the back and spoke to her and asked her whether or not—I told her that I had spoken to her sister-in-law and what Myrtle had told me, and whether or not she wanted to change her testimony, and she said no, she told the truth and did I want her to say something that wasn't true, and I said, 'No, I want you to tell the truth. If that is the truth the way you see it, then we certainly don't want you to tell a lie on the stand.' I went back to Mr. Thompson and told him, and Mr. Thompson told me, 'We might as well send her back because it would just be a repetitious testimony."

Morris Scharff and Myrtle both denied that any statements were made that any girl who joined the union would be fired. They were not believed.

■ Although there is a variance, not a very great one we think, between the version of Mrs. Ewing and that of Morris Scharff as to what transpired at their hearing room discussion, there is, we think, somewhat more of a difference between the testimony of Mrs. Ewing and the Board's finding based upon her testimony. A footnote of the Board's Decision and Order reads:

"Similarly, as the Trial Examiner has not specifically done so, we also discredit Morris Scharff's testimony here to the effect that he did not attempt to get Ewing to change her testimony in the prior case but only told her to tell the truth. We rather credit Ewing's testimony to the effect that Scharff did attempt to get her to change her previous testimony adverse to the Respondent, and her denial that Scharff told her to tell the truth."

We think it is doubtful that "he thought maybe I'd like to change my statement," warrants the inference that Mrs. Ewing had testified that "Scharff did attempt to get her to change her previous testimony." The Board purports to credit Mrs. Ewing's "denial that Scharff had told her to tell the truth." The record shows that Mrs. Ewing was asked "Isn't it true that he told you he wanted you to tell the truth?" Her evasive reply was, "And I did. I told him that I had told the truth." She was again asked if Scharff had told her that he wanted her to tell the truth and to this second query she responded, "I don't know that he said that. I don't recall him saying those words. * * *" We are often reminded that it is the province of the Board to credit or discredit the testimony given at its hearings. Here, it seems, the Board has credited testimony which was not given.

About ten days after the episode in the hearing room Mrs. Ewing was given a different job. Her earnings were not enough on a piecework rate to equal the minimum rate and she was given make-up pay. She was told by Morris Scharff that he was dissatisfied with her production. Her production increased slightly but was still insufficient to take her out of the make-up pay group. Scharff told her maybe she would do better if she was suspended for a week, and a week's suspension was invoked. Mrs. Ewing returned and her piecework earnings were still less than the minimum requirement. On December 5, 1958, Mrs. Ewing was discharged, and she was told that the reason was her failure to improve her production. At the hearing Scharff testified that Mrs. Ewing was discharged because of her failure to bring up her production and because she did not do as much work as she was capable of doing.

In the earlier case it appeared that Mrs. Ewing had been a member of the union and of its organizing committee. She had engaged in no union activity for more than ten months prior to her discharge on December 5, 1958. The union filed a charge alleging that Mrs. Ewing had been discharged "because of her testimony" in the prior proceeding. The complaint adopts the charge and alleges also that Mrs. Ewing was discharged because "of her membership in and activities on behalf of the union, and because she engaged in concerted activities with other employees for the purpose of collective bargaining and other mutual aid and protection." The Board found it proper to consider the findings in the prior case, "not as evidence of unfair labor practices herein, but only as background evidence to evaluate Respondent's conduct herein."

■ In his findings the Examiner stated that "Except for the self-serving testimony of Morris Scharff, it does not appear that Respondent had adopted a policy of discharging employees for failure to make production in its piecework operations." It is a general rule that extra-judicial self-serving statements are generally inadmissible as evidence on behalf of the party making them, but we have not before seen it suggested that the sworn testimony of a witness is to be discredited because it supports that for which he contends. Examiner, "from all the circumstances of the present case considered with the background of animosity toward the union disclosed in the previous proceedings," discredited the testimony of Morris Scharff as to the reason for Mrs. Ewing's discharge. The Examiner considered the evidence before him "in conjunction with the material evidence and findings in" the prior case and reached the "conclusion that the theory of economic justification advanced

here by Morris Scharff for the discharge or disciplinary suspension of Violet Ewing on December 5, 1958, was only a pretext to obscure the discriminatory motive apparent in the previous proceeding of discouraging membership in the union, and in the present case of punishing this employee because she has given testimony under the Act." The Board sustained the Examiner and, as we have shown, went beyond the findings of the Examiner in its inferences against the Respondent. The Board ordered the payment to Mrs. Ewing, for her lost time which would be for eight weeks, as she was recalled on January 30, 1959, and ordered the posting of a notice.

The Examiner's findings both as to the credibility of Morris Scharff and as to the motive for the discharge of Mrs. Ewing are dependent upon an Examiner's findings and the Board's decision in the prior case. Credibility of a witness is a matter which is to be determined by the trier of fact in the particular case. 58 Am.Jur. 487, Witnesses § 860. The disbelief by the Examiner in the former case of the testimony there given by Morris Scharff is not entitled to consideration, by a different Examiner in a different case, as to whether he should credit or discredit the testimony given in the latter case by the witness. A prior determination that a witness is not to be believed is not res judicata, 98 C.J.S. Witnesses § 470, p. 348. In the opinion in the prior case we discussed the rules applicable to the testimony there given by Morris Scharff. Those principles are also applicable here.

In the former case we declined to enforce the Board's order for reinstatement with back pay of the employees, Mrs. Ewing included, who had been laid off by the Respondent. Since it has been decided that much of the background evidence of the findings in the prior case, here relied upon, has been found unsupported, we turn to the question of whether, without the background of the findings which we must reject, there is sufficient evidence on the record considered as a whole to permit a finding that the discharge of Mrs. Ewing on December 5, 1958, was unlawful. N. L. R. B. v. Winter Garden Citrus Products Cooperative, 5 Cir., 1958, 260 F.2d 913. The Board made a finding which it states is implicit in the Examiner's findings, that Mrs. "Ewing's most recent union activity of testifying in behalf of the union in the earlier case was the immediate cause for her last discharge, her earlier union activity which led to her initial lay-off was the mediate and underlying cause for her last discharge." Since we have held, in the other case, that the Board's finding that the initial lay-off was discriminatory was without substantial supporting evidence, that phase of the finding as to mediate and underlying cause can be put aside.

In the testimony of Mrs. Ewing it was stated that Morris Scharff, at their hearing room discussion, had said that she seemed unhappy and "he thought maybe that I'd like to change my statement." This is not too different from Scharff's testimony that he asked her whether or not she wanted to change her testimony. No matter which of the two witnesses is credited, we see nothing to justify the finding that Scharff had attempted to get Mrs. Ewing to change her testimony or to warrant the inference that the giving of the testimony and not wanting to change it was the cause of her discharge.

Having reached these conclusions it follows that enforcement of the Board's order will be denied. We see no need for the consideration of other evidence which is relied upon as tending to show that Mrs. Ewing was a capable employee who ought not have been discharged.

Enforcement denied.