## NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
## WALTON MANUFACTURING COMPANY, Respondent.
### No. 18345.

United States Court of Appeals
Fifth Circuit.
March 17, 1961.

Wisdom, Circuit Judge, dissented in part.

---

178

Russell Specter, Atty., N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, Stuart Rothman, Gen. Counsel, Melvin Pollack, Attys., N.L.R.B., Washington, D. C., for petitioner.

1. 29 U.S.C.A. § 158 (a) (1).

2. That was more than a year after the conduct considered in N. L. R. B. v. Walton Mfg. Co. and Loganville Pants Co., 5

Robert T. Thompson, Alexander E. Wilson, Jr., Wilson, Branch & Barwick, J. Frank Ogletree, Jr., Atlanta, Ga., for respondent.

Before RIVES and WISDOM, Circuit Judges, and CHRISTENBERRY, District Judge.

RIVES, Circuit Judge.

This petition seeks enforcement of a cease and desist order of the Board based upon findings that respondent violated Section 8(a) (1) of the Act [1] by promulgating rules which (1) forbade its employees from engaging in union solicitation in the plant during nonworking time, and (2) required its employees to conduct collective bargaining through a management-employee committee sponsored by respondent.

The findings rest entirely upon a nine-page, mimeographed document which the respondent issued and distributed to its employees on or about April 10, 1959,[2] entitled:

"Employment Policies and Rules for Employees of Walton Manufacturing Company, Loganville, Ga."

That document starts with a declaration of policy:

"These pages contain some of the principal policies and rules which have been established for the purpose of maintaining good employee relations, promoting the general welfare of the employees and the Company, and encouraging orderly and efficient operations. From time to time the Company will review these policies and rules and will make such changes, additions, and deletions as appear necessary to meet changing conditions."

The document is then divided into five main parts, the contents of which

Cir., 286 F.2d 16, m/s, decided January 6, 1961, and N. L. R. B. v. Walton Mfg. Co., 5 Cir., 286 F.2d 26, m/s, decided January 6, 1961.

are fairly indicated by their captions and principal subcaptions:

"Part I—Hours, Wages, and General Provisions.
"Section A—Hours of Work.
"Section B—Overtime Work.
"Section C—Payroll Practices.
"Section D—Holidays.
"Section E—Vacations.
"Section F—Reporting Pay.
"Section G—Seniority.
"Section H—Upgrading.
"Section I—Temporary Assignments.
"Section K—Layoffs and Rehirings.
"Section L—Leaves of Absence for Illness, Injury and Other Legitimate Reasons.
"Section M—Insurance and Hospitalization.
"Part II—Joint Committee on Safety, Sanitation and Advisory Matters.
"Part III—Grievance Procedure.
"Part IV—General Working Conditions.
"Part V—Regulations.
"Section A—What Every Good Employee Should Know.
"Section B—Merit Ratings.
"Section C—Thing to Avoid.
"Section D—Rules and Regulations Concerning Absences and Tardiness."

The alleged violations involve particularly the following parts of the document:

"Part II—Joint Committee on Safety, Sanitation and Advisory Matters.
"(1) There will be a Joint Management-Employee Committee for safety, sanitation and advisory matters which will meet at least once monthly. The purpose of this committee shall be to work together to improve safety of operations, sanitation and cleanliness of the premises, and the general welfare of the employees and the Company.

"(2) The employee membership of this committee shall consist of one representative from each of the departments (or sections) listed below:
"1. Cutting and shipping departments
"2. Pressing department
"3. Assembly section
"4. Sleeve and lining sections
"5. Pocket, fronts, and finishing sections
"6. Office
"(3) The representative from each department shall serve a two months term and will then be succeeded by the next member of their department, in order of seniority sequence. Thus, each employee will ultimately have an opportunity to serve from time to time.

"(4) Employee committeemen shall cooperate with the management representative on the committee in planning the program and agendas of meetings and in obtaining maximum attendance by committee members.

"(5) The meetings of the committee will be held outside of regular working hours whenever possible, however, for time spent attending the regular monthly meetings of the committee, the committee members will be compensated at their regular straight time hourly rate.

\* \* \* \* \* \*

"Part V—Regulations.
"Section A—What Every Good Employee Should Know.

\* \* \* \* \*

"(3) *Carrying on Outside Business*—conducting outside business on company property without obtaining permission from your department head is prohibited. This includes solicitations of money or memberships, selling lottery chances or any other items, and the posting or circulating of advertisements, circulars and handbills.

\* \* \* \* \* \*

"Section C—Thing to Avoid.

"Group II (g). Commission of any of the following acts shall furnish cause for immediate discipline, including discharge:

\* \* \* \* \* \*

"Conducting outside business on company property without the Company's permission, including solicitations of money or memberships, the sale of lottery chances or any other item, and the posting or circulating of advertisements, circulars, or handbills."

The unfair labor practice charge was filed only two weeks after the respondent had issued and distributed the document to its employees; and at the time of the hearing before the Trial Examiner the management-employee committee had not been established.

The Board concluded that respondent, in violation of Section 8(a) (1) of the Act,[3] had unlawfully interfered with the organizational rights of its employees guaranteed by Section 7 of the Act,[4] by (1) promulgating a rule prohibiting employees from soliciting union membership or distributing union circulars and handbills in the plant during their non-working time; and (2) imposing a requirement that employees bargain collectively through a management-employee committee sponsored by respondent.

The Board's order requires respondent to cease and desist from engaging in the unfair labor practices found, or from in any like or related manner interfering with its employees' organizational rights; to distribute to each employee a written notice rescinding the rules found unlawful by the Board; and to post appropriate notices.

■■ Company rules prohibiting organizational solicitation on company property may serve production, order, and discipline, and are not necessarily violative of the Act.[5] In this connection, a distinction must be observed between rules applicable to employees and those applicable to nonemployees. A no solicitation rule applicable to employees during their non-working time unlawfully interferes with their right to discuss self-organization among themselves, unless the employer proves special circumstances that make such a restriction necessary to maintain production or discipline.[6] No contention is made in this case of the existence of any such special circumstances.

Respondent's contention on this charge is that the document prohibits solicitations of membership only when that is a part of the conduct of "outside business," and that union activity by employees cannot properly be considered as "outside business." According to respondent's brief, "the only legal justification for transacting union business on company property (absent some peculiar circumstance not present here) is that it is the business of the employees—it is the exercise of their rights. Well if it is their business and they are the ones who cannot be denied the right to engage in it on company premises, then it is not 'outside' business within the clear terms of the rule under consideration."

Whether respondent infringed upon its employees' freedom to engage in union or concerted activity guaranteed by Section 7 of the Act depends upon the reasonably foreseeable effects of its conduct upon its employees. An employee notified by his employer that "conducting outside business on company property \* \* \* includes solicitations of \* \* \* memberships," and that doing so "shall furnish cause for immediate discipline, including discharge," might well be deterred, or else reasonably assume that he

---

3. See note 1, supra.

4. 29 U.S.C.A. § 157.

5. N. L. R. B. v. United Steelworkers, CIO, 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1372.

6. Republic Aviation Corporation v. N. L. R. B., 324 U.S. 793, 65 S.Ct. 982, 89 L. Ed. 1372; N. L. R. B. v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975.

acted at his peril. At least that inference was open to the Board.[7]

 The Board could reasonably believe that the employees would understand the proscription to be directed against the solicitation of union memberships. It is not limited to working time, and no showing is made of special circumstances which might justify the breadth of the prohibition. In that state of the record, we agree with the Board that it is unlawful on its face.

 As to Part II of the document, "Joint Committee on Safety, Sanitation and Advisory Matters," the Board found that respondent's announcement of such a management-employee committee also violated Section 8(a) (1) of the Act, by unlawfully interfering with the organizational rights of its employees guaranteed by Section 7 of the Act. Section 7 guarantees to employees "the right to self-organization" and "to bargain collectively through representatives of their own choosing."

The Board's view was that Part II would be reasonably understood by the employees to require them, as a condition of employment, to conduct any collective bargaining they might desire through a management-employee committee, sponsored, formed and assisted by the employer—a clear violation. See N. L. R. B. v. Cabot Carbon Co., 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175.

It is true that the committee never came into being, but respondent's announcement was more than an expression of desire to create the committee. It was a positive and unequivocal statement that, "There will be a joint Management-Employee Committee etc.," and a requirement that, "the representative from each department shall serve etc." That the unfair labor practice charge was filed almost as soon as the document was distributed, and that the management-employee committee was not actually established, do not detract from the coercive effect of the document itself.

Respondent's more plausible defense is that the expressed purpose of the committee was to deal with matters of safety and not with conditions of employment. Part II states that, "the purpose of this committee shall be to work together to improve safety of operations, sanitation and cleanliness of the premises, and the general welfare of the employees and the Company." Respondent argues that the broad concluding expression, "and the general welfare of the employees and the Company," should be limited to the preceding specific matters, "safety of operations, sanitation and cleanliness of the premises." Whether or not the employees would naturally give the phrase such a lawyerlike construction might be better determined by the Board with its experience and expertise than by this Court.[8]

It may be noted that the identical phrase, "the general welfare of the employees and the company," was employed also in the policy declaration at the beginning of the document. Even lawyers should naturally and properly construe the document as a whole. The Board's reasoning we find to be certainly rational, if not indeed conclusive:

"As to contention (2), we find, as the Trial Examiner did, that because the committee was 'to work together to improve,' among other things, 'the general welfare of the employees and the Company,' and so far as appears conditions of employment were

---

7. That the respondent might look on union activities as "outside business" was plainly indicated by its earlier letter sent to employees, quoted in N. L. R. B. v. Walton Mfg. Co. et al., 5 Cir., 286 F.2d 16, 20:

"We are happy that no employee has to pay dues or initiation fees to any outside union to work at these plants. You will not be forced to make payments to outsiders for the privilege of working here. What earnings you make here are yours. No part goes to organizers."

8. See N. L. R. B. v. Seven-Up Co., 1953, 344 U.S. 344, 348, 73 S.Ct. 287, 97 L.Ed. 377; Franks Bros. Co. v. N. L. R. B., 1944, 321 U.S. 702, 64 S.Ct. 817, 88 L. Ed. 1020; N. L. R. B. v. Standard Oil Co., 2 Cir., 1943, 138 F.2d 885, 887.

the only matters of common interest between management and the employees, and because the part of Respondent's April 1959 notice to the employees dealing with the committee appears in the middle of a 'Magna Charta' of employment covering everything usually set out in a collective bargaining agreement, the committee was intended to deal with conditions of employment and was so understood by the employees, despite the absence of any explicit reference to wages, hours or other conditions of employment."

The petition to enforce the Board's order is granted.

WISDOM, Circuit Judge (dissenting in part).

Sometimes, pushing right to the extreme becomes wrong. No one can question the rightness of a policy intended to preserve the integrity of collective bargaining by labor representatives free of interference from management. Everyone would agree that in carrying out this policy the Board and the courts should regard employer-employee committees with suspicion and scrutinize them carefully in order to prevent an employer's using a committee as a company-dominated labor organization or as a device for frustrating rights guaranteed labor under Section 7 of the Act. But this policy becomes too much of a good thing when it is pushed so far as to leave no place for a bona fide, socially desirable employee committee or joint employer-employee committee that is something less than a labor organization and something more than a Great Books Study Group. The Board, with a bull-dog grip, has seized on a policy of unyielding hostility to all employee committees. This method of attacking a problem shows a certain grim determination that in some situations is a virtue. It is not a virtue, as this case demonstrates to me, when the Board assumes the policy has a universal applicability the policy does not possess.

To my mind, an inflexible attitude of hostility toward employee committees defeats the Act. It erects an iron curtain between employer and employees, penetrable only by the bargaining agent of a certified union, if there is one, preventing the development of a decent, honest, constructive relationship between management and labor.[1] The Act encourages collective bargaining, as it should, in accordance with national policy. The Act does not encourage compulsory membership in a labor organization. The effect of the Board's policy here is to force employees to form a labor organization, regardless of the wishes of the employees in the particular plant, if there is so much as an intention by an employer to allow employees to confer with management on any matter that can be said to touch, however slightly, their "general welfare". There is nothing in Cabot Carbon, or in the Labor-Management Act, or in any other law that makes it wrong for an employer "to work together" with employees for the welfare of all. There is nothing wrong—provided that the committee through which employer and employees work is not in fact a labor organization within the meaning of Sections 2(5), 29 U.S.C.A. §§ 152(5) and 8(a)(2) and is not used by the employer to infringe on labor's right of self-government and other rights in violation of Section 8(a)(1).

I make these observations, because I regard the Board's policy against all employee committees (in practice, if not in theory) as a dangerous departure from the law and one that may have unfortunate, far-reaching social and economic effects. I make them with great deference, and I do mean great deference, because I respect the motives, expertise, and accomplishments of the Board in a field of law presenting enormous difficulties to a policing agency.

1. See Feldman and Steinberg, Employee-Management Committees and the Labor Management Relation Act of 1947, 35 Tul.L.Rev. 365 (1961); Petro, Labor Relations Law, 35 N.Y.U.L.Rev. 732, 765 (1960).

The complaint against Walton charged, first, that the "Joint Committee on Safety, Sanitation and Advisory Matters," provided for in Part II of the booklet,[2] "Employment Policies and Rules", "*is*" a labor organization "formed, assisted and dominated by the Company" for the purpose of dealing with it as a labor organization. The General Counsel requested the Board to issue an order "disestablishing" the committee as an unlawful labor organization. At the time of the hearing, no members had been appointed to the Committee. The Committee never met, never functioned, never came into existence. Notwithstanding, the General Counsel argued that the announcement of the method of designating employee members, by publication of the Company Rules, was sufficient to support a finding that the Committee did indeed exist. Powerful as the Board's policy is against employee committees, the Board could find no way of ordering the disestablishment of an unestablished committee. The Trial Examiner and the Board were compelled to find no violation of Section 8(a) (2).

There is more than one way to skin a cat. The Trial Examiner made the finding that he was "satisfied" the committee "was intended" to concern itself with "wages, hours, or conditions of employment". He held that announcement of the Rules imposed on employees, as a condition of employment, "a requirement that collective bargaining must proceed on the basis of a labor organization to be sponsored, formed or assisted by the company"; that this infringed upon the employees' freedom to engage in union or concerted activity guaranteed by Section 7 of the Act, and thereby coerced them in violation of Section 8(a) (1). The Board agreed, stating, as if it were a fact, that "the announcement [of the Rules] represented a fixed intention on the part of Respondent to set up such a committee which would be the only method of collective bargaining available to the employees, and as found below this was the vice of

the announcement". I have been unable to find one word in the Rules expressing or implying that the committee was to be "the only method" or that it was a method of collective bargaining available to the employees. There is nothing in the Rules to prevent the employees organizing an independent union or one affiliated with the Amalgamated Clothing Workers of America, AFL–CIO, the charging party, or setting up some other machinery of their own for collective bargaining.

What is the basis for this extensive finding? A hearing with witnesses in an effort to determine how the Committee was in fact "intended" to function? Or how the employees did in fact regard the Committee? Not at all. Walton offered to prove that the "object and intention of the company, if this committee is set up, is not to deal with the committee in any way concerning grievances, wages, working conditions, fringe benefits, or any of the other matters which come within the meaning of the National Labor Relations Act, as amended." The Trial Examiner refused to allow any proof as to the purpose or meaning of the rule on the ground that testimony as to "future conduct" would be improper.

Such evidence seems to me to be relevant and necessary to a proper decision in a case resting on an assumed intention extrapolated from two words having an extensible meaning when they are taken out of context. The Company Rules are unclear on their face. The testimony was admissible therefore to clarify the meaning. Even in interpreting a commercial contract, the tight rules of evidence allow testimony to show the construction the parties place on an ambiguous term of a contract. Here, the Examiner and the Board found that "notice of the Rules was tantamount to an individual contract of employment". If the problem be narrowed down to the "foreseeable effect" of the Committee (especially its authority to deal with "the general welfare of the employees"), evidence

2. See majority opinion.

would seem to be relevant as to what was the effect. In Cabot Carbon, as in most of the cases on the subject, the Court pierced the committee title, looked beyond the language of the by-laws, and made an effort to find out how the committee in fact functioned and what was its real purpose. This process of ferreting out what the Board or a court considers is the purpose or the inner nature of a committee should be as fair for management as for labor. The employer should have as much chance to prove that a committee is not a labor organization as a complainant has to prove that it is a labor organization. In short, besides reaching an erroneous conclusion the Trial Examiner deprived Walton of its day in court.

What evidence is there to support the Examiner and Board? None—in the form of testimony. The elaborate conclusions of the Examiner and the Board are like an immense inverted pyramid balanced precariously on its apex. Naturally, it teeters. The whole pyramid rests on the single phrase, *"the general welfare"*, thrown in at the end of a sentence, reading: "The purpose of this committee shall be to work together to improve safety of operations, sanitation and cleanliness of the premises, and the general welfare of the employees and the Company."

If the Company Rules constituted the terms of an ordinary contract—the Board held that they do constitute conditions of an employment contract—one would have to say that such a clause, following the specific references to "safety of operations, sanitation, and cleanliness of the premises", should be construed as referring to matters similar to those specifically stated. One would say, further, that as to these things—safety, sanitation, and cleanliness—they relate to the general welfare, and that the employer

and the employee have a common interest in their improvement. These subjects do not remotely resemble such controversial subjects as those listed in Section 2(5) —"grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work". These are the natural bones of contention between employer and employees to be "dealt with", in the Cabot Carbon sense, and to be fought over at the bargaining table. A man does not need to be a lawyer to understand the difference between the topics listed in Part II of the Rules and the topics listed in Section 2(5).

If Part II of the Company Rules, The Joint Committee on Safety, Sanitation, and Advisory Matters, were the only rule, the argument of the Board would be somewhat more meaningful. But Part II takes up one page as against eighteen printed pages which cover in detail hours of work, overtime, payroll practices, holidays, vacations, seniority, upgrading job classifications, layoffs and rehirings, leaves of absence for illness, insurance and hospitalization, grievance procedure, grounds for discharge, disciplinary action, absences and tardiness. It is inconceivable to me that these matters would have been set forth in such detail without any reference to the Committee, or that Part II would have contained no reference to these matters—if, in fact, the intention had been that the Committee would function as a collective bargaining agent. In Cabot Carbon the Court considered grievances so important that it said, the existence of committees [360 U.S. 203, 79 S.Ct. 1022] "at least in part, for the purpose 'of dealing with employers concerning grievances * * *' alone brings these committees squarely within the statutory definition of 'labor organizations'". The detailed procedure governing grievances set forth in Part III of Walton's Policies and Rules [3] is in-

3.
Part III
Grievance Procedure
The Company intends to provide and maintain an opportunity for each individual employee to present his questions, complaints or grievances as they occur, without fear of retaliation or other discrimination. In return, the Company expects that the employees will promptly present any complaints or griev-

consistent with any notion that "complaints or grievances" fall within the jurisdiction of the Committee.

The term "general welfare", construed as if the remainder of the sentence containing it and the other eighteen pages of rules did not exist, of course, may be interpreted to refer to wages and hours or anything else touching the welfare of employees. Such a construction however makes all of Part II meaningless. Thus, the Board does not contend, at least, not in this proceeding, that formation of a joint committee on safety, sanitation, and cleanliness imposes on the employees a requirement to use the committee as a labor organization in collective bargaining with the company. Yet safety measures may affect the general welfare too, and a difference between employer and employee as to what is necessary for safety may be so great as to serve as the chief subject for a collective bargaining agreement. If the term "general welfare", as it is used in Part II, makes a committee a labor organization, we have reached the point where any employee committee of any kind is a labor organization—since there is nothing a committee can deal with that does not affect the general welfare of the employees.

The Board's syllogism is that: (1) "general welfare" of the employees and the company can refer only to matters of a common interest; (2) the only matters of a common interest to an employer and employee are wages, hours, and conditions of employment (construed to mean matters usually set out in a collective bargaining agreement); therefore, (3) a committee to work together to improve the general welfare is a committee to serve as a collective bargaining

agent. I find the minor premise (ambiguous middle and all) an unhealthy non sequitur. It seems especially unwarranted if applied, as in this case, to a plant where because of the lack of majority representation there is no medium for communication between employer and employee—even as to such matters as safety, sanitation, and cleanliness. The Act does not go so far, although there may be a collective bargaining agreement. Thus, Section 9(a), 29 U.S.C.A. § 159(a) allows a "group of employees * * * to present grievances to their employer" on any matter not in conflict with the agreement, without the presence of a bargaining representative, if he is afforded an opportunity to be present.

There is internal evidence that the Committee was not intended as collective bargaining machinery. (1) The term "advisory" is used twice, once in the heading of Part II and again in the first sentence, "There will be a Joint Management-Employee Committee for safety, sanitation and advisory matters." A labor organization is not an advisory group; bargaining agents are not advisors; a collective bargaining agreement is not the product of advice. (2) The employee members of the Committee consist of one representative from each of six departments, each of whom serves a two months term, to be succeeded by the next member in order of seniority. "Thus", the rules say, "each employee will ultimately have an opportunity to serve from time to time." If this committee were a bargaining agent, it would be the strangest one on record. Bargaining agents are never low men on the totem pole, chosen regardless of ability.

---

ances which they may have as they arise, and that they will be presented in an orderly manner.

(1) Employees should present their complaints or grievances in the following manner:

(a) The matter should first be discussed with the employee's immediate supervisor.

(b) If an employee feels that his complaint or grievance has not been satisfactorily settled by his immediate supervisor, the employee should present his complaint or grievance to the Plant Manager, who will give the employee a decision within three days.

(c) If the employee desires further consideration of his complaint or grievance, he should promptly go to one of the owners who will review the matter as soon as possible and render a decision within ten days.

Labor would not stand for such representation. And, no company would dare to negotiate or feel safe in negotiating with such representatives of employees.

The Act has three sections pertinent to the question before us—Sections 2(5), 8(a) (2), and 9(a).

Section 2(5) defines a labor organization as "any organization of any kind, or agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." These are specifics. They are the viscera of the relationship of employer to employee. Section 2(5) contains no omnibus clause and no general language broad enough to be equivalent to "general welfare". If a committee does not deal with such matters as those listed in Section 2(5), it is not a labor organization.

Section 8(a) (2) forbids an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; provided, that * * * an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay." The section expressly allows conferences between an employer and employees. It seems most unlikely to me that Congress would permit conferences of employer with employees— but not through a committee on safety, sanitation, cleanliness and the general welfare.

We come now to Section 9(a). This section gives the right to "any individual * * * or a group of employees [if not a labor organization] * * * to present grievances to their employer." As Cabot Carbon teaches, Section 9(a) does not authorize an employer to form or maintain an employee committee for the purpose of "dealing with" the employer on behalf of employees, concerning grievances; and, nothing in the amendment authorizes an employer to engage in dealing with an employer dominated labor

organization. If there can be grievances affecting a group of employees that do not affect the "general welfare", I should like to know what they are. In N. L. R. B. v. Associated Machines, 6 Cir., 1955, 219 F.2d 433, 437, the Court construed "grievances" as referring to "major disputes", to "collective rather than individual or group complaints", "to correct[ing] the past or existing status of that relationship". In that case the Court held that an employee committee was not a labor organization, although the committee dealt with plant efficiency, new equipment, everything but wages.

I read these sections 2(5), 8(a) (2), and 9(a) as contemplating employer-employee cooperation, as long as it does not take the form of a labor organization dominated or improperly influenced by the employer. One of the purposes of the Act was to soften the dog-eat-dog attitude of management and labor in some industries. Discussing this statutory objective in Chicago Rawhide Mfg. Co. v. N. L. R. B., 7 Cir., 1955, 221 F.2d 165, 167, the Court said:

"These two Sections are designed to prevent the employer from having any influence (except by free speech) over unions or the employees' choice thereof. 'Support' is proscribed because, as a practical matter, it cannot be separated from influence. A line must be drawn, however, between support and cooperation. Support, even though innocent, can be identified because it constitutes at least some degree of control or influence. Cooperation only assists the employees or their bargaining representative in carrying out their independent intention. If this line between cooperation and support is not recognized, the employer's fear of accusations of domination may defeat the principal purpose of the Act, which is cooperation between management and labor."

The Seventh Circuit held that "cooperation" between the employer and employee giving rise to the *possibility* of control was not enough to amount to unlawful

employer domination. That is the approach I would take here in dealing with a non-existent committee designed to concern itself, when formed, with safety, sanitation, cleanliness, and general welfare.

Cabot Carbon does not hold that there can be no employee committees. The Supreme Court held that [360 U.S. 203, 79 S.Ct. 1021]. "the declared purposes and actual functions of these Committees shows that they existed for the purpose, in part at least, 'of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.'" The Committees "undertook the 'responsibility to,' and did, '[h]andle grievances [with respondents on behalf of employees] at nonunion plants'". This alone brought the Committees within the statutory definition of "labor organizations". The Cabot Carbon committees, therefore, came within the meaning of "labor organization", as the term is used in Section 2(5) and 8(a) (2). These are not the facts here.

The Conference report on the bill that ultimately became the Labor-Management Act of 1947, however it may be interpreted as rejecting employee committees of the Cabot Carbon type, seems to indicate congressional approval of some form of employer-employee group cooperation. H.R. 3020, the Hartley bill, contained a section, 8(d)3, expressly stating that an employer is not guilty of an unfair labor practice if he forms or maintains a committee of employees and discusses with it "matters of mutual interest [even] including grievances, wages, hours of employment, and other working conditions", if there is no certified union representative under Section 9. Mr. Hartley, co-sponsor with Senator Taft, of the Labor-Management Act of 1947 explained the section as an exception to Section 8(a) (2), permitting employers to "setup labor-management committees . . . [for the] discuss-[ion of] matters of mutual interest", when the employees have not designated a bargaining agent. The Conference Committee rejected Section 8(d) (3) of the Hartley bill in favor of Section 9(a) of the Taft bill in the Senate. In explanation the conferees stated:

"Section 8(d) (3) of the amended Labor Act in the House Bill provided that nothing in the act was to be construed as prohibiting an employer from forming or maintaining a committee of employees and discussing with it matters of mutual interest, if the employees did not have a bargaining representative. This provision is omitted from the conference agreement since the act by its terms permits individual employees and groups of employees to meet with the employer and section 9(a) of the conference agreement permits employers to answer their grievances."

The Supreme Court has foreclosed, for lower courts, any argument that Section 9(a) was intended to do the work of Section 8(d) (3). It has not wiped out 9(a), nor the conferees' enlightening explanation of 9(a).

In this case, perhaps because of the inherent uncertainty in the Act as to the line, if any, between employee committees and labor organizations, the Board has gone a good deal further than it has ever gone before in finding an unfair labor practice in an employer's proposed formation of an employee committee as a labor organization. I do not say that in every case the Board must wait until the objectionable committee is organized and has acted. In a clear-cut case the Board should be able to nip mischief in the bud or before budding. But I say that in the circumstances of this case, the mere possibility of construing "general welfare" *(out of context)* as encompassing Section 2(5) matters, and the mere possibility of the committee functioning some time in the future as a labor organization are not sufficient to support a finding of an unfair labor practice. A legal basis for the order is therefore lacking.

It seems to me that with just a touch of good will on both sides, the litigation could have been avoided by an amendment of the Rules curing the ambiguity in Part

II. The order itself is not objectionable. It amounts to an amendment of Part II stating what, in effect, is the Company position—that the committee is not a labor organization and employees are free to engage in collective bargaining through any union of their own choosing.

The inoffensive nature of the order does not mean that I have been shadow-boxing. The case raises important questions that were not settled by Cabot Carbon: Are all employee committees or joint employer-employee committees labor organizations? If not, what are the criteria for determining when such a committee is a labor organization? The answers to these questions affecting our national labor policy seem to fall more naturally within the province of Congress than within the province of courts. If I may say so, a helping hand from Congress would make life easier for the Board, management and labor.