**NATIONAL LABOR RELATIONS BOARD v. GENERAL SHOE CORP.**

No. 11331.

United States Court of Appeals
Sixth Circuit.

Nov. 26, 1951.

Samuel M. Singer, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers, Samuel M. Singer, all of Washington, D. C., and Leonard S. Kimmell, Cincinnati, Ohio, on the brief), for petitioner.

Cecil Sims, Nashville, Tenn. (Cecil Sims, Nashville, Tenn., on the brief), for respondent.

Before HICKS, Chief Judge, MARTIN and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

After careful consideration of the record as a whole and thoughtful study of the authorities cited in the briefs, we have reached the conclusion that the petition of the National Labor Relations Board for enforcement of its order must be granted. We are unable to distinguish, in principle, the present controversy from National Labor Relations Board v. Tappan Stove Company, 6 Cir., 174 F.2d 1007, wherein we reluctantly granted enforcement of the Board's order. The same authorities which impelled our conclusion there are found controlling here.

There is substantial evidence to support the findings of the Labor Board, which adopted with only one inconsequential deviation the findings of the Trial Examiner. The pith of the Board's findings are thus stated in the following paragraph: "Moreover, we are convinced, from the entire record, that the effect of the five nominally separate committees is that of a single employee representation plan dealing with all the matters normally the subject of collective bargaining. As the committees deal with the Respondent concerning grievances, wages, hours of work, and conditions of employment, we find that all of them collectively, as well as each of them separately, including the Finance Committee, constitute labor organizations within the meaning of the Act. The Respondent's interference with, and domination and support of, these committees constitute a continuing obstacle to the full exercise by its employees of their right to self-organization and to bargain collectively through

representatives of their own choosing, in violation of Section 8(a) (2) and Section 8(a) (1) of the Act [29 U.S.C.A. § 158(a) (1, 2)]."

Actually, there were no controverted issues of fact in the case. The respondent, a Tennessee corporation with its principal office at Nashville, owns and operates eighteen manufacturing plants and three warehouses in Tennessee, Kentucky, Georgia and Alabama, and concedely is engaged in interstate commerce in the manufacture, distribution and sale of shoes and other related leather goods. It has never recognized any labor organization at any of its plants as the bargaining representative of its employees.

The complaint of the Labor Board against the respondent was based upon a charge by Boot and Shoe Workers Union, A. F. of L., that the respondent has engaged in, and is now engaging in, unfair labor practices as defined in the National Labor Relations Act. There were no members of the complaining union in the employ of the respondent corporation. This is immaterial, however, to the right of the Labor Board to issue and maintain the complaint. In National Labor Relations Board v. Indiana & Michigan Electric Co., 318 U.S. 9, 17, 18, 63 S.Ct. 394, 399, 87 L.Ed. 579, the Supreme Court, in reversing the decision of this court, said: "We cannot agree with the view of the Circuit Court of Appeals that the evidence might disqualify Local B-9 from making the charge of violation against the Company or deprive the charge of force and effect, and thereby defeat the Board's jurisdiction to hear the case.

"The Act requires a charge before the Board may issue a complaint, but omits any requirement that the charge be filed by a labor organization *or an employee*. [Italics supplied.] In the legislative hearings Senator Wagner, sponsor of the Bill, strongly objected to a limitation on the classes of persons who could lodge complaints with the Board. He said it was often not prudent for the workman himself to make a complaint against his employer, and that strangers to the labor contract were therefore permitted to make the charge. The charge is not proof. It merely sets in motion the machinery of an inquiry. When a Board complaint issues, the question is only the truth of its accusations. The charge does not even serve the purpose of a pleading. Dubious character, evil or unlawful motives, or bad faith of the informer cannot deprive the Board of its jurisdiction to conduct the inquiry." See also Kansas Milling Co. v. National Labor Relations Board, 10 Cir., 185 F.2d 413; Consumers Power Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 38.

While, as previously stated, no labor union functioned at any of the respondent's plants as a bargaining representative, there were five committees constituted, organized and installed in its plants by the company, namely: Advisory, Grievance, Benefit, Safety, and Finance. The functions of these committees were described in an "Employees Handbook," published by the company and distributed to its various employees. This handbook listed "guaranteed policies, practices and procedures" of the company in relation to personnel. Almost every conceivable kind of suggestion or complaint by employees could be handled by one of these committees. The company, moreover, published and distributed to its employees a newspaper, "The General," and a newsletter, "Keeping Posted."

Employees elected committeemen at regular intervals in the plants during working hours. Such elections were conducted jointly by the personnel office of the company and a member of the Advisory Committee. The time for an election was set by the management; and the ballots used were prepared and furnished by it at the company's expense. Election to membership on the various committees was made by popular vote of the employees and, under respondent's policy or rule, a committee member must have been a non-supervisory employee and a worker in the department in which the election was held. His term of office was six months, or one year, and no employee could be a member of more than one committee. If he were transferred to

another department or promoted to a supervisory position, he lost membership on the committee automatically. All committees conducted their business on company time and on company property and were supplied by the employer with stationery and with stenographic, secretarial, bookkeeping and printing services, without charge.

Employee representatives on the five committees were paid at the rate of $1.60 an hour for time spent at committee meetings. This expense was borne by the company with respect to the Advisory, Grievance and Safety Committees, but the members of the Finance and Benefit Committees were paid out of funds administered by those two committees. The rate of pay was arbitrarily established by the company at a generally higher rate than the prevailing wage scale paid in the highest paying plant.

The Advisory Committee was formed, according to the 1949 Employees Handbook, for the purpose of affording "an opportunity for employees, individually or collectively, to have a voice in management." The handbook stated that the committee is useful, also, "as an advisor on future company policy that directly affects the employees"; that another major function of the committee is the "handling of suggestions and questions", but that the committee has no authority "to make final decisions", such falling within the purview of the plant superintendent. The Advisory Committee met once a month, special meetings being sometimes called by the plant personnel manager, who, with the plant superintendent, usually attended the meetings and participated in the business on hand. The personnel manager served as secretary, and prepared the minutes of the committee meetings, which were subsequently published in the company newspaper, "The General," and posted on a bulletin board.

Minutes of the Advisory Committee's meetings reveal that a wide variety of topics concerning the employees, including wages and rates of pay, hours of employment, conditions of work, efficiency of production, and recreational activities were discussed. At various meetings, the subject of discussion has embraced compensation for holiday work, vacation pay, minimum guaranteed wages, general wage increases, job classification, wage determining methods, overtime work, lunch and rest periods, regularity of employment and job security, discrimination in job assignments, determination and application of seniority, procedure for layoffs, reduction of waiting time for work, unsafe or improperly guarded equipment, improvements of facilities and equipment, lighting, heating and ventilation, parking facilities, maintenance of cleanliness of plant and equipment, and many other matters affecting working conditions.

The Grievance Committee handled at its monthly meetings, which were attended by the plant superintendent and the personnel manager, the usual type of employee complaints, such as discharges, layoffs, seniority, pay, working conditions, and favoritism. The committee considered the complaint of the employee presented on a form furnished by the company, and voted either for allowance or for disallowance, its decision being announced in the meeting and published later in the monthly Newsletter. The recommendations of the committee were referred for decision to the vice-president of the company; and, if an employee were dissatisfied with that particular decision, he could submit his complaint to the president of the company "for final decision." As was found by the Trial Examiner, *"employees are not permitted to make group grievances, but are required to act as individuals";* and "the Grievance Committee handles matters pertaining to wages, hours, and other terms and conditions of employment." [Italics supplied.]

It would seem unnecessary to detail the activities of the Benefit Committee, which provides specified financial aid to employees in case of bona fide illness or injury and, also, death benefits to an employee's family. The Safety Committee performs the functions which its name implies, and the Finance Committee operates lunch bars, snack stands, coca cola machines and similar concessions for the convenience of the

employees and includes in its budget expenditures for athletics and for recreational and social activities of the employees. The plant personnel manager functions as a cooperative adviser to these committees also.

The National Labor Relations Act provides in section 2(5), 29 U.S.C.A. § 152: "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

The Trial Examiner concluded that the Advisory, Grievance, Safety and Benefit Committees are clearly employee-representation committees, or plans within the foregoing statutory definition. He rejected the argument of respondent that there is no evidence showing that the committees at any time engaged in collective bargaining with it. He pointed out that the evidence amply shows that the respondent discussed, advised and dealt with all four committees concerning grievances, wages, hours, and other terms and conditions of employment; and that neither an agreement nor actual bargaining is essential to a finding that an organization is a labor organization within the meaning of the Act. He also rejected the contention of respondent that there is no evidence to support a finding of domination over and support of the committees by the respondent. The evidence in the whole record substantially supports this conclusion, in which the Examiner was upheld by the National Labor Relations Board.

█ The Board held the company liable only for violations of the Act subsequent to December 20, 1948, in view of the time limitation contained in section 10(b) of the Act [29 U.S.C.A. § 160(b)], it being admitted that the company organized the Grievance Committee at the Carollton and Danville plants and the Finance, Safety and Grievance Committees at the Waynesboro plant during 1949. It was proper, however, for the Labor Board to consider, as it did, the background evidence as shedding light upon the company's actions during the statutory period. Labor Board v. Newport News Co., 308 U.S. 241, 244–249, 60 S.Ct. 203, 84 L.Ed. 219; Labor Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 268–270, 58 S.Ct. 571, 82 L.Ed. 831; National Labor Relations Board v. M. A. Hanna Co., 6 Cir., 125 F.2d 786; National Labor Relations Board v. American Rolling Mill Co., 6 Cir., 126 F.2d 38; American Enka Corporation v. National Labor Relations Board, 4 Cir., 119 F.2d 60. Cf. Federal Trade Commission v. Cement Institute, 333 U.S. 683, 705, 68 S.Ct. 793, 92 L.Ed. 1009.

█ In the instant case, the activities and functions of the committees in dealing with the respondent company's management concerning the numerous matters which have been specified constitute a labor organization within the coverage of the statute. See National Labor Relations Board v. Precision Castings Co., 6 Cir., 130 F.2d 639; National Labor Relations Board v. Jas. H. Matthews & Co., 3 Cir., 156 F.2d 706 [relating to employee committees generally similar in function to those encountered here]; Wyman-Gordon Co. v. National Labor Relations Board, 7 Cir., 153 F.2d 480. See also Subin v. National Labor Relations Board, 3 Cir., 112 F.2d 326, 329–330, certiorari denied 311 U.S. 673, 61 S.Ct. 38, 85 L.Ed. 433; Bethlehem Steel Co., v. National Labor R. Board, 74 App.D.C. 52, 120 F.2d 641, 644, 645; American Smelting & Refining Co. v. National Labor Relations Board, 8 Cir., 126 F.2d 680, 683; W. W. Cross & Co. v. National Labor Relations Board, 1 Cir., 174 F.2d 875.

Inasmuch as the fact findings of the Labor Board are supported by substantial evidence upon the record as a whole and its conclusions of law are lawfully and appropriately drawn, the petition for enforcement of its order is granted.