**FEDERAL–MOGUL CORPORATION, COLDWATER DISTRIBUTION CENTER DIVISION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17873.

United States Court of Appeals
Sixth Circuit.

May 21, 1968.

John C. O'Meara, Detroit, Mich., for petitioner; Daniel J. Tindall, Jr., Detroit, Mich., on brief; Dickinson, Wright, McKean & Cudlip, Detroit, Mich., of counsel.

Arthur A. Horowitz, Atty., N. L. R. B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Paul J. Spielberg, Atty., N. L. R. B., Washington, D. C., on brief.

Before O'SULLIVAN and PHILLIPS, Circuit Judges, and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

This cause is before the Court upon petition of Federal-Mogul Corporation, Coldwater Distribution Center Division (Coldwater), for review of an order of the National Labor Relations Board issued on April 6, 1967. The Board has cross-petitioned for enforcement of its order. The Board's order and decision are reported at 164 NLRB 131. This Court has jurisdiction of the proceeding, the alleged unfair labor practices having occurred in Coldwater, Michigan, within this judicial circuit. Section 160(e), Title 29, U.S.C. The Board determined that Coldwater violated sections 158(a) (1) and (2), U.S.C. by dominating, interfering with, supporting and assisting the Coldwater Distribution Center Employee Representative Committee (the committee).

Coldwater is a Michigan corporation which manufactures, sells and distributes various products at its Coldwater installation. The committee was formed in the late 1940s and is a labor organization within the meaning of the Act. Section 152(5), Title 29, U.S.C. The committee is composed of one employee from each of Coldwater's six departments plus one additional employee from the second shift. These representatives are elected annually by the employees. The committee meets monthly with management except during periods of collective bargaining when the meetings are as often as necessary. Following these meetings the representatives report back to their fellow employees the substance of what was discussed at the meetings. No pay is lost for time spent at either the monthly meeting with management or the report-back meeting. Only on very rare occasions are management officials present at the report-back meetings. In 1966, management began to take minutes of the monthly meetings with the committee, distribute copies to representatives and post additional copies on company bulletin boards. Before posting and distributing them, the representatives are asked to make corrections and approve the minutes.

The committee has no formal constitution or by-laws and does not assess its members or collect any dues. The only formal mention of the committee is in the collective bargaining agreement of September 28, 1965. No similar provision was contained in any of the previous agreements. In response to a question by one of the committeemen as to the function and status of the committee, Coldwater's Industrial Relations Manager, William C. Porter, suggested that something be put in the agreement concerning the committee. Porter drafted a suggested paragraph, and after some discussion and changes, the following clause was added to the collective bargaining agreement:

## EMPLOYEE REPRESENTATIVE COMMITTEE

"In the interest of developing and maintaining good communications between the employees and management, an employee representative committee has been established. The committee has been made up of one employee from each section. The committee meets with management at least once each month; however, meetings may be called at more frequent times should the occasion arise. All hourly personnel are encouraged to communicate their questions and concerns either directly to their supervisors or to the employee representative. After regular or special meetings with management, the representatives will report back to the employees in their section. The names of representatives and the sections they represent will be posted on the bulletin boards."

The order of the Board now before us in these proceedings is the result of an unfair labor practice charge filed by Truckdrivers Local Union No. 297, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, (the union), charging Coldwater with dominating, interfering with and supporting the committee. The union had begun an organizational campaign among the affected employees in January, 1966. A representation petition was filed with the Board by the Union on February 28, 1966. Subsequently, when the unfair labor practice charge was filed and a complaint issued, General Counsel deferred action on the representation petition.

The Board without holding any specific acts of Coldwater to be unfair labor practices found that the evidence when viewed in its totality amounted to assistance, interference and domination, in violation of Sections 8(a) (1) and (2) of the Act. In addition to its usual order to cease and desist and to post appropriate notices, the Board ordered Coldwater to withhold all recognition from the committee and completely disestablish

the committee as bargaining representative of its employees.

■ Section 8(a) (2) of the Act makes it an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or to contribute financial or other support to it." Section 158(a) (2), Title 29, U.S.C. The Act guarantees that employees will be as free as possible to determine their course of dealings with their employers. The potential for managerial interference and domination exists in the very nature of the employer-employee relationship. It is not the potential for control that the Act declares unlawful but the actual domination of a labor organization and employer interference in employee freedom of choice. Modern Plastics Corp. v. N.L.R.B., 379 F.2d 201 (C.A.6); Chicago Rawhide Manufacturing Company v. N.L.R.B., 221 F.2d 165 (C.A.7). To proscribe anything less than actual domination would place serious limitations on the very cooperative efforts the Act was designed to encourage. Inasmuch as it is the employees' freedom of choice that is protected by the Act the test of whether a labor organization is unlawfully dominated or supported is subjective from the standpoint of the employees. Modern Plastics Corp. v. N.L.R.B., supra; N.L.R.B. v. Sharples Chemicals, Inc., 209 F.2d 645 (C.A.6).

■ The Act does not prohibit cooperation between management and a labor organization; on the contrary it encourages it. Modern Plastics Corp. v. N.L.R.B., supra; Chicago Rawhide Manufacturing Company v. N.L.R.B., supra; Coppus Engineering Corporation v. N.L.R.B., 240 F.2d 564 (C.A.1); N.L.R.B. v. Valentine Sugars, 211 F.2d 317, (C.A.5). The difficult task is to distinguish between unlawful domination, interference and support, and permissible cooperation. Cooperation and support are not synonymous. It is only when management's activities actually undermine the integrity of the employees' freedom of choice and independence in

dealing with their employer that such activities fall within the proscriptions of the Act. Managerial cooperation with a labor organization which does not have the effect of inhibiting self-organization and free collective bargaining is encouraged under the Act.

■ The fact that an employer is dealing with a relatively weak union, one without a charter, constitution, or independent financial support, does not alter the test to be applied in determining if an 8(a) (2) violation has been committed. Modern Plastics Corp. v. N.L.R.B., supra. An affiliated labor union, by means of its high degree of organization and financial resources, is more equipped than a poorly organized employees' committee to withstand managerial attacks on its integrity and independence. But this does not mean that all employees' committees, and unaffiliated or "company" unions are under management's control. The test is still whether management has actually interfered with the functioning of such a labor organization "enabling the employer to induce adherence of employees to the (labor organization) in the mistaken belief that it was truly representative and afforded an agency for collective bargaining." National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831. The Act itself provides in Section 10(c) that "in determining whether a complaint shall issue alleging a violation of subsection (a) (1) or (a) (2) of section 158 of this title, and in deciding such cases, the same regulations and rules of decision shall apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope."

■ In the instant case we are obviously dealing with a weak labor organization having no constitution, by-laws or possessed of any means of independent financial support. These factors may create an unstable organization susceptible to managerial control, but no in-

ference of actual domination can be drawn from these facts alone. Modern Plastics Corp. v. N.L.R.B., supra. Any employer has the potential power through promotion, transfer and discharge, to affect the status of an employee for organizational purposes. However, in the absence of specific evidence that an employer has so used these powers this factor is of little weight in determining whether an employer has violated Section 8(a) (2) of the Act. No committeeman has ever been involuntarily transferred by Coldwater.

 The trial examiner conceded that preparation of minutes by management, payment to employees for time spent in negotiations, and a provision for monthly meetings are common industrial practices. Therefore, these factors, which if provided to an affiliated union, would not be the basis for an 8(a) (2) violation, cannot be the basis for finding that an employer has dominated, interferred with or supported a nonaffiliated union without additional proof.

The Board in reaching its conclusion relied upon the fact that Coldwater "exercised arbitrary control over the scheduling of its meetings with the committee." The Board points to the incident in December 1965, when Coldwater twice changed the times of a special meeting they had called. In January, 1966, Personnel Manager McCullough advised Baker that a decision on a certain problem of interest to Baker would not be made until Packaging Department Supervisor Houtz returned from his leave and that the meeting requested by Baker should be postponed until then. McCullough issued a statement in February, 1966, to packaging department employees, in which he stated:

> "The employee representative may request that a special meeting be held, however, it is up to the Personnel Department to determine the practicality of the request."

The collective bargaining agreement signed in September, 1965, provided that special meetings may be convened if necessary. It does not make attendance at such meetings compulsory, and it would seem that the committee would have the same prerogative as management claimed in its memoranda of February 18, 1966. To further show Coldwater's arbitrary control of meeting schedules, the Board seems to rely on the fact that the committee agreed to change the day of its regular monthly meeting with management from Wednesday to Tuesday. However the uncontradicted evidence of the Board's own witness indicated that McCullough first requested that the day be changed because he was involved in some college recruiting work on Wednesday. This change was then made with the consent of the committee. Such an insignificant change to fit the convenience of McCullough, who asked for and did not order the change, can hardly be said to be arbitrary control of the meeting schedule.

The Board overemphasizes the significance of a decision to change the time of elections of committeemen. Prior to the change, a committeeman was elected for a one-year term at any time during the year that the previous term ended or a vacancy occurred. As a result there was considerable overlap in the terms of the representatives on the committee. At one of the monthly meetings with management, Baker testified that someone, he could not remember who, suggested that the term of office of all committeemen should all begin and end on the same date and that an alternate be elected at the same time. McCullough agreed that this was desirable and suggested that all elections be held on the first Monday in January. The matter was discussed and the committeemen agreed with McCullough's suggestion as to the time of the election. It is true that the election and term of office of committeemen is primarily a concern of the committee. There is no evidence to indicate that McCullough raised the issue of simultaneous terms and alternate representatives. It was only after someone else expressed concern about the

problem that he suggested a date for the elections. McCullough's suggestion was reasonable and did not involve pressing his will on the committee. Under these circumstances, little would be accomplished by requiring management to remain silent at the peril of an unfair labor practice charge.

The Board also considered it significant that following the resignation of all the committeemen in September, 1965, Coldwater "urged that employees reconstitute the Committee as it had existed." The Board strongly suggests that the committee withdrew its resignation only "as a personal favor" to Plant Manager White. The record is devoid of any evidence to support such a conclusion. The resignations occurred in September, 1965, during the final stages of the collective bargaining negotiations between management and the committee. Baker resigned as committeeman when he was told by two management officials that a safety problem he was interested in was none of his concern. The other committeemen resigned in support of Baker. White did make a plea to the committeemen to stay on as a personal favor to him. However this is only one of the many things he said to them at the meeting between management, the senior employees and the committee. It was only after the senior employees privately persuaded the committeemen to withdraw their resignations, that they did so. Two days later the collective bargaining agreement was signed. It cannot reasonably be said that the committeemen remained on as a personal favor to White, and thereby demonstrated that they were controlled by management. Quite the contrary, this evidence demonstrates the independence of the committee and shows their resolve to stand fast against attempted control by Coldwater.

It is true, as the Board says, that Coldwater "attempted" to control the matters discussed at the report-back meetings. However, Committeeman Baker, who was the object of such warnings, was adamant in his belief that he was free to report back anything he felt important, including management's attempts to limit his discussions. As was said earlier, mere attempts at dominations and control are insufficient. There must be proof of actual control. Such was not the case here.

Another problem both management and the committee had with the report-back sessions was the amount of time to be allotted to them. The committeemen complained that insufficient time was available and management claimed too much working time was being taken. Committeeman Baker raised this complaint at several of the monthly meetings. Management at first was rather reluctant to grant more time but by February, 1966, it agreed to 15-minute meetings with more time if necessary. Presently management and the committee agree on the time needed for the report-back meetings at their monthly meetings. The meetings now last from 20 to 25 minutes and there have been no complaints from either side. It is true that management may have wanted to limit the time spent at such meetings, but the committee resisted until an amenable settlement was reached. Such settlement, being a result of good faith, give-and-take negotiations, is in accord with the spirit of the Act.

Further reliance is placed by the Board upon the outcome of a series of meetings held in February, 1966. Several problems and complaints were aired at these meetings including back-to-back vacations, compulsory overtime, Baker's failure to secure the special meeting he requested earlier, clarification of job classification, and lack of time in which to report back to employees. Coldwater agreed to the committee's position on back-to-back vacations. In connection with the settlement of an employee grievance, management suggested that an arbitration clause be inserted into the contract which the employees subsequently rejected. Such action can hardly be called control. The Board intimates that the reason for these conces-

sions and overtures was the impending organizational drive by the Teamster's union at the plant. To support this interpretation the Board relied on the credited testimony of Baker that McCullough said that an outside union was unnecessary and that White suggested that the committee formally organize itself. White denies that he or McCullough made such statements. However the Board's position on this point is completely undercut by its finding that "there is no evidence to show that (Coldwater) was aware of the Teamster's organizational activity."

The negotiations leading to the collective bargaining agreement signed on September 28, 1965, were concededly "carried on in a strictly arms' length, give-and-take manner." The committee effectively represented the employees and argued convincingly and persuasively on their behalf. The committee's behavior throughout the negotiations demonstrated that it was not a tool by which management was able to control the choice of its employees. The committee was a free agent and conducted itself accordingly. It is this factor which distinguishes this case from N.L.R.B. v. H & H Plastics Manufacturing Company, C.A.6, 389 F.2d 678, decided February 15, 1968. Although there are several similarities between the cases, the "Employees Committee—H & H Plastics Manufacturing Co." clearly was not free to run its internal affairs and conduct negotiations without managerial interference and domination. The entire evidence in this case is consonant with the complete independence and integrity of the committee.

The fact that the collective bargaining agreement makes mention of some aspects of the committee's organization was not held controlling in Modern Plastics Corp. v. N.L.R.B., supra, and we do not think it controlling herein. See also Coppus Engineering Corporation v. N.L.R.B., supra. The trial examiner agreed that it was common industrial practice for collective bargaining agreements to provide for departmental representation and for monthly meetings with management.

■■■ In view of the totality of the evidence presented in this case, we cannot say that the payment to employees for the time spent at the report-back meetings supported a finding of an unfair labor practice in the absence of proof that it led to and fostered domination and control. Such practice, in the present case, is another example of the healthy cooperation that continues to exist between the committee and management.

The relationship between Coldwater and the committee, in this case, presents an excellent example of cooperative efforts between labor and management. The committee continues to be a free and independent avenue of employee expression. In spite of its weak organization it remains an effective advocate of employee rights. To order its disestablishment would be contrary to the purposes of the Act.

For these reasons we conclude that there is not substantial record evidence to support the findings and order of the Board. Section 160(e), Title 29, U.S.C.

The Board's order is set aside and the Board's cross-petition for enforcement is denied.