**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STREAMWAY DIVISION OF the SCOTT & FETZER COMPANY, Respondent.**

No. 80–1507.

United States Court of Appeals, Sixth Circuit.

Submitted Jan. 20, 1982.

Decided Oct. 22, 1982.

As Amended Nov. 5, 1982.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

John C. Flinker, Duvin, Flinker & Cahn Co., Cleveland, Ohio, for respondent.

Before ENGEL, Circuit Judge, WEICK, Senior Circuit Judge, and COHN,* District Judge.

ENGEL, Circuit Judge.

The National Labor Relations Board ("the Board") petitions for enforcement of a decision and order reported at 249 NLRB No. 54 (1980). The order granted relief consistent with the Board's determination that Streamway Division of the Scott & Fetzer Company ("the Company") had violated sections 8(a)(1) and (2) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1) and (2), by dominating and interfering with the formation of and giving

support to the In-Plant Representation Committee ("the Committee"), which the Company had organized and established. The Board also found that the Company had violated section 8(a)(1) of the Act by interrogating its employees concerning their union sentiments. We deny enforcement.

Streamway Division of Scott & Fetzer Company produces and sells water faucets and valves at its Westlake, Ohio plant. Two attempts by the United Auto Workers, in October 1976 and again in November 1977, failed to obtain majority support for its efforts to be certified as the collective bargaining agent for the Company's production and maintenance employees.[1] The Union filed no objections to the conduct of either election, and no unfair labor practice charges emerged, either before or after those elections.

In March, 1977, the Company established and outlined the structure of the Committee. According to directions embodied in a notice to all hourly employees, a working committee was intended to be established as a part of the Company's program to develop "more readily accessible channels of communications within Manufacturing Operations" and "to provide coordination between plant personnel and management."

The expressed goal of the Committee was "to provide an informal yet orderly process for communicating Company plans and programs; defining and identifying problem areas and eliciting suggestions and ideas for improving operations." To accomplish this end, a working committee was to meet. Initially, one general meeting and one departmental meeting in each of the four departments in the Company was to be held each month. The committee was to include eight employee representatives,[2] and man-

---

* Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. The Union filed election petitions on these dates. The record does not disclose when the first election was held; the second was held in January 1978.

2. Four representatives were to be elected from six categories of Assembly employees, with not more than one representative from each category; two were to be elected from the Machine Shop; one was to be elected from the "Polish and Buff" Department; and one was to be elected from the "P & I Control" Department.

agement personnel would be present at both general and departmental meetings.[3]

The Company avowedly planned that the Committee would "provide to as many employees as possible the opportunity of direct input." It therefore set forth a rotating schedule of initial terms to be served which varied from three to six months, with all terms thereafter to be three months in duration. To maximize employee participation in the program, no employee was to serve, other than the initial term, for more than three months in a calendar year. At the time of the second UAW certification election in February 1978, the Committee had been operating for several months.

The Company also sought to communicate with its employees by retaining Personnel Research and Development Corporation ("PRADCO") to conduct an attitude survey of managerial, clerical, and production and maintenance employees in August, 1978. Before beginning the survey, the company president held a meeting and asked employees to be candid with the representatives. The top nine executives of the Company met separately with a PRADCO representative; all other employees, including production and maintenance workers, met in groups of five to seven in an effort to survey employee reactions to the Company's policies. PRADCO made both written and oral reports to management, and sessions were tape recorded. At the same time, the representatives of PRADCO assured the employees that all responses were to be kept confidential and that only PRADCO personnel had access to the tapes. PRADCO's written report indicated that no effort was made to link names with faces or to identify any participants.

It was claimed, and the Board found, that employees were improperly questioned concerning their attitudes towards unions during the course of the PRADCO survey.[4] At approximately the same time, for several weeks commencing in early July, an employee distributed authorization cards of the International Molders & Allied Workers Union.

Several unfair labor practice charges were filed against the Company in October and November, 1978 and in January, 1979.[5] The Administrative Law Judge found that the Company dominated and interfered with the Committee, which he determined was a labor organization as defined in section 2(5) of the Act, 29 U.S.C. § 152(5). He found further that the inquiries by PRADCO regarding Unions constituted interrogation of employees in violation of section 8(a)(1) of the Act. The Board adopted the ALJ's order on May 8, 1980.

**3.** Management representatives for general meetings were to include the Vice President of Operations, the Manufacturing Manager, P & I Control Manager and the Personnel Manager. The various departmental meetings were to include either the Vice President of Operations and the Manufacturing Manager or the Vice President of Operations and P & I Control Manager.

**4.** Two employees reported exchanges with PRADCO representatives regarding a Union; the Administrative Law Judge ("ALJ") found both statements credible. One employee testified that the representative asked "something about the people being unhappy, and is that why we were getting a union in there." Appendix at 43. She stated she did not recall the precise language used, but "[b]asically what I recall him saying was—is that the reason that we felt we needed a Union was because of all the things we had mentioned." *Id.* Another employee reported the following exchange:

A. The only real question the man had asked us as we were going out the door was how we felt about a union.
Q. Did anyone reply to that question?
A. I did. I asked him why, and he said because I told him I was for a Union, and I asked him why he asked, and he said nothing.
Q. Is that the only comment that was made about a Union?
A. Yes.
Appendix at 99.

**5.** There is no evidence on this record regarding whether a third certification election was held following distribution of authorization cards. The unfair labor practice charges were unconnected to either of the earlier election campaigns, which preceded the charges by several months.

## I

Section 8(a)(2) of the Act prohibits domination or support of a "labor organization."[6] The Board upheld the ALJ's determination that the Committee formed by the Company was a "labor organization" as defined in section 2(5) of the Act, 29 U.S.C. § 152(5), which provides:

The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate *and which exists for the purpose,* in whole or in part, *of dealing with employees* concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(emphasis added). We think there is little question that if it is a "labor organization" under section 2(5) of the Act, the Committee was dominated by the Company. It was expressly mandated by the Company, and the Company controlled its composition and its meetings. Therefore, we think it follows that if the Committee was in fact a labor organization, the Company was guilty of a violation of section 8(a)(2). *See NLRB v. H & H Plastics Mfg. Co.,* 389 F.2d 678 (6th Cir. 1968). We are, however, convinced that the Committee was not, under any enlightened view of the Act, a labor organization as above defined.

Because a labor organization is defined as an "organization of any kind" for purposes of the Act, the recurrent question is whether an organization exists to "deal" with employers regarding conditions of work. The term "dealing" in the Act was interpreted in *NLRB v. Cabot Carbon Co.,* 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1958). In *Cabot Carbon,* an employee committee had been established and endowed with the responsibility to handle grievances. It also made and discussed proposals respecting a wide variety of the aspects of the company's employee relationships, including seniority, job classifications, job bidding, make-up time, overtime records, time cards, merit systems, vacations, sick leave, and the like. The committee was instrumental in altering several conditions of work.[7] Members of the local committee formulated a list of proposals which they presented directly to the Director of Industrial Relations at the central corporate office. Because its powers did not expressly include "bargaining," the Fifth Circuit held that the committee was not a labor organization. *Cabot Carbon Co. v. NLRB,* 256 F.2d 281 (5th Cir. 1958). In short, it found that "dealing with" was synonymous with "bargaining with" and was therefore limited to committees which actually engaged in collective bargaining.

In reversing, Justice Whittaker disagreed. *NLRB v. Cabot Carbon Co.,* 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1958). He emphasized that the final text of the Act expressly rejected more restrictive language which would have defined labor organizations as groups engaging in collective bargaining;[8] he concluded that

---

**6.** Section 8(a)(2) of the Act, 29 U.S.C. § 158, provides:

(a) It shall be an unfair labor practice for an employer—

    *    *    *    *    *    *

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided,* that subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay . . . .

**7.** "Among other things, respondents' plant officials agreed to Employee Committee requests to change from a company to a plant seniority system . . .; to provide longer notice periods concerning jobs up for bid; to permit employees to report early and leave early on weekends; to establish an annual basis for allocating overtime; and to install vents in the roofs of warehouses." *NLRB v. Cabot Carbon Co.,* 360 U.S. 203, 208 n.6, 79 S.Ct. 1015, 1019 n.6, 3 L.Ed.2d 1175 (1958).

**8.** The Court also rejected an argument that labelling employee committees as labor organizations "would prevent employers and employees from discussing matters of mutual interest concerning the employment relationship, and would thus abridge freedom of speech . . . ." 360 U.S. at 218, 79 S.Ct. at 1024. It stated that the Board's order did not bar such speech; instead, it "merely preclude[d] the employers

the term "dealing" should be more broadly construed. Finding that the "Committee undertook the 'responsibility to,' and did 'handle grievances,'" 360 U.S. at 213, 79 S.Ct. at 1022, Justice Whittaker concluded that "it is plain as words can say that these committees existed, at least in part, for the purposes 'of dealing with employers concerning grievances ....'" This alone brings these committees squarely within the statutory definition of 'labor organizations.'" *Id.*

Justice Whittaker went on to observe that the meetings consisted of a series of "proposals and requests with respect to matters covering nearly the whole scope of the employment relationship." *Id.* at 214, 79 S.Ct. at 1022. Although Justice Whittaker stressed the continuous course of contacts between the committee and both local and central management, and stated that "dealing" often involves making recommendations, he did not indicate the limitations, if any, upon the meaning of "dealing" under the statute. Because the Supreme Court has not spoken further on this issue, the question of how much interaction is necessary before dealing is found is unresolved.

Our circuit has been quick to find that "advisory committees" were company dominated labor organizations where in fact a pattern of dealing existed. For example, in *NLRB v. General Shoe,* 192 F.2d 504 (6th Cir. 1954), a series of committees, including an Advisory Committee and a Grievance Committee, were set up to consider a myriad of employment conditions. Our court found substantial evidence supported the Board's finding that "the effect of the five nominally separate committees is that of a single employee representation plan dealing with all matters normally the subject of collective bargaining." *Id.* We found that the Advisory Committee was itself a labor organization when viewed against the background evidence presented, because it "handled suggestions and questions," and it

served as both an "advisor" on company policy and as a means of communication for employees. The aggregate effect of a system of several committees was considered in *NLRB v. Sharples Chemicals,* 209 F.2d 645 (6th Cir. 1954), where our court found the committees were part of a "single employee representation plan," which "afforded the employees a means of securing from the respondent satisfaction of their grievances and improvement of their working conditions," and therefore were labor organizations. *Id.* at 652.

At the same time, logic and experience under the Act since these early cases dictate that not all management efforts to communicate with employees concerning company personnel policy are forbidden on pain of violating the Act. An overly broad construction of the statute would be as destructive of the objects as the Act as ignoring the provision entirely. Thus there is particular force in the logic of Judge John Minor Wisdom, dissenting in *N.L.R.B. v. Walton Mfg. Co.,* 289 F.2d 177, 182 (5th Cir. 1961):

> To my mind an inflexible attitude of hostility toward employee committees defeats the Act. It erects an iron curtain between employer and employees, penetrable only by the bargaining agent of a certified union, if there is one, preventing the development of a decent, honest, constructive relationship between management and labor. The Act encourages collective bargaining, as it should, in accordance with national policy. The Act does not encourage compulsory membership in a labor organization. The effect of the Board's policy here is to force employees to form a labor organization, regardless of the wishes of the employees in the particular plant, if there is so much as an intention by an employer to allow employees to confer with management on any matter that can be said to touch, however slightly, their "general welfare".

from dominating, interfering with or supporting such employee committees which Congress has defined to be labor organizations." We think the same analysis would apply to the Compa-

ny's contention that the proviso to section 8(a)(2), see note 2 *supra,* allowing employees to confer with employers, precludes a finding that an employee committee is a labor organization.

There is nothing in *Cabot Carbon,* or in the Labor Management Act, or in any other law that makes it wrong for an employer "to work together" with employees for the welfare of all. There is nothing wrong—provided that the committee through which employer and employees work is not in fact a labor organization within the meaning of Sections 2(5) . . . and 8(a)(2) and is not used by the employer to infringe on labor's right of self-government and other rights in violation of Section 8(a)(1).

Somewhat similar considerations have influenced decisions of both our circuit and the Board itself. Two Sixth Circuit cases considering whether labor organizations were dominated illustrate our more recent attitude toward the meaning of section 8(a)(2) of the Act. In *Modern Plastics v. NLRB,* 379 F.2d 201 (6th Cir. 1967), our court joined a minority of circuits indicating that the adversarial model of labor relations is an anachronism. There the court rejected a Board finding that an organization was dominated by the company merely because of the weakness of the organization. The committee received no dues and did not operate under a constitution or by-laws. The company paid for food and drink and compensated committee members for time spent attending meetings. These facts, the Board held, indicated company domination of the committee. Our circuit disagreed, observing that the strength or weakness of the committee, if it were truly representative of the employee, was a matter of little concern to the Board or to the Act itself; the real question was whether the company dominated the decisions of the committee. Our court in *Modern Plastics* indicated strong policy reasons for encouraging cooperation:

A prime purpose of the Act is to foster industrial peace through collective bargaining. For many years the company and the committee have worked in harmony with that purpose to the benefit of the employees. To permit the Board to abort this relationship because an outside union wants to take over, in the face of lack of substantial evidence of domination, would be a disservice to the Act, as well as to the employees which the Act seeks to protect.

379 F.2d at 204–205. In *Federal-Mogul Corp., Coldwater Distribution Center Division v. NLRB,* 394 F.2d 915 (6th Cir. 1968), where it was shown that committee members were compensated by the company for time spent at meetings and that the committee had no formal constitution or by-laws and did not collect dues, our court held that it was not the potential for control that the Act declared unlawful. "It is only when management's activities actually undermine the integrity of the employees' freedom of choice and independence in dealing with their employer that such activities fall within the proscriptions of the Act." 394 F.2d at 921.

*Modern Plastics* and *Federal-Mogul* presuppose the existence of a labor organization and consider domination, which is not the focus of our inquiry here.[9] They indicate, however, that our circuit is willing to reject a rigid interpretation of the statute and instead consider whether the employer's behavior fosters employee free expression and choice as the Act requires.

Although the Board has generally interpreted the term "labor organizations" broadly,[10] it too recognizes that employee committees may communicate with the employer without violating the Act. In *General Foods Corporation and American Federation of Grain Millers, AFL–CIO and Its Local 70,* 231 NLRB No. 122 (1977), the Board found that committees established by the employer were not labor organizations.

**9.** At least one commentator has construed *Modern Plastics* and other "cooperation" cases to suggest a new standard for illegal domination, based upon the intent to coerce. *See Note, New Standards for Domination and Support Under Section 8(a)(2),* 82 Yale L.J. 510, 519–525 (1973).

**10.** *See, e.g., Sea Life, Inc. and Construction in General Laborer's Union, Local 368,* 175 NLRB No. 168 (1969).

The company had established teams, divided according to job assignments. Each team, acting by consensus, made job assignments, assigned job rotations and scheduled overtime. Each team had meetings to discuss such topics as a compensation system and the objectives of each team or group of employees. A psychologist was hired to improve internal communications among team members and to build "trust levels" among the teams, and members discussed conditions of work such as compensation at their meetings. Notwithstanding the facial similarity between this activity and the language of the Act, the Board adopted the trial examiner's finding that the teams were not labor organizations. Although the examiner stressed that the committees were merely administrative subdivisions of employees and did not serve in a representative capacity, he also found significant that:

> Unlike many of the cases cited by the Charging Party and the General Counsel, the teams herein were not established to head off incipient organizing drives by outside unions nor did they come into existence as a result of any unrest in the bargaining unit which was sensed by Respondent.

231 NLRB No. 122 at 1234.

■ A case presenting facts similar to those here is *Mercy-Memorial Hospital Corporation and Local 79, Service Employees International Union, AFL–CIO,* 231 NLRB No. 182 (1977). There a group was designated to investigate grievances and to render decisions, but the Board nonetheless determined that it was not a labor organization. Again the Board adopted determinations by the trial examiner, who in turn had accepted the employer's argument that the committee existed not to deal with management but to give employees a voice in resolving the grievances of fellow employees. More important for our purposes here, the examiner determined that the committee was not a labor organization even though a policy statement provided that "the committee does have the right and the obligation to recommend to the director of personnel and all other administrative heads ... any changes in rules, regulations, and standards," and the committee actually made recommendations regarding conditions of employment. Clearly, then, communication between a committee and management does not itself bestow labor organization status upon a group.

Our facts here do not fit precisely within either *Cabot Carbon* or within those of *General Foods and Mercy-Memorial, supra.* Nevertheless, an examination of the record as a whole satisfies us that the limited functions of the Committee here more closely resemble those in the latter decisions. As in *General Foods,* the Committee was a part of a company plan to determine employee attitudes regarding working conditions and other problems in an accurate and effective way, for the Company's self-enlightenment, rather than a method by which to pursue a course of dealings. Although we acknowledge that the difference between communication of ideas and a course of dealings at times is seemingly indistinct, we believe, nevertheless, that it is vital here.

Although *Cabot Carbon* cautions against a restrictive reading of the term "dealing," it involved a more active, ongoing association between management and employees, which the term dealing connotes, than is present here. The Board offered no evidence of a continuous interaction between employer and committee other than recital of the committee's purpose to "allow employees to question, complain about, or raise matters concerning conditions of employment," Petitioner's Brief at 2, and that the committee actually complained. *Id.* at 4. Whatever the reach of *Cabot Carbon* beyond the facts of that case, we do not think it applies here. We cannot accept the Board's suggestion that *Cabot Carbon* should be read so broadly as to call any group discussing issues related to employment a labor organization.

■ Several factors convince us that the committee is not a labor organization. The continuous rotation of Committee members to ensure that many employees participate makes the Committee resemble more closely

the employee groups speaking directly to management on an individual, rather than a representative, basis as in *General Foods.* Moreover, the ALJ determined he could find no employer hostility or anti-union animus in the present case, even by inference from circumstantial evidence. The Board offers no evidence connecting the creation of the committee to the organizational drive that occurred months afterward. The Board in *General Foods* considered whether anti-union sentiment existed at the time the committees were formed. Similarly, in both *Modern Plastics, supra,* and *Federal-Mogul, supra,* our court considered lack of anti-union animus to be a factor in the determination that the employer's activities comported with the purposes of the Act.

Finally, neither the employees, nor the Committee, nor, so far as we can ascertain, the union involved in two certification elections, seems to have considered that the Committee even remotely resembled a labor organization in the ordinary sense of the term. In fact, quite the contrary appears to have been the assumption among all who must indeed have been familiar with its operation. If the Committee were in fact a labor organization within the meaning of the Act, its members or the company on its behalf might have been expected to have interposed this as a bar to the efforts to seek certification of the UAW as collective bargaining agent. No such action occurred here, and the election was held without incident and objection, resulting in the defeat of the union. *Federal-Mogul, supra,* indicates that unless employees are encouraged "in the mistaken belief that [a committee is] truly representative and afford[s] an agency for collective bargaining," no interference with employee choice, essential to a finding that the Act has been violated, occurs. 394 F.2d at 918.[11] The Board offers no evidence that anyone viewed the committee as anything more than a communicative device. *Cf. Cincinnati Gasket Packing & Mfg. Co. v. NLRB,* 395 F.2d 268

(6th Cir. 1968) (company's intention that committee "serve as a channel of communication" precluded a finding that it recognized, and then withdrew recognition from, committee as bargaining agent).

We recognize that the facts here have not precisely arisen before. We also recognize, however, as does the Board, that at some point a literal translation of section 2(5) will frustrate the very purposes of the Act itself. This, we think, has occurred here.

Two certification elections have occurred in the span of time covered by this litigation. No unfair labor charges were filed. Those elections provided the employees with an uncoerced opportunity to make an intelligent choice between the status quo and the alternative benefits of a formal contract, reached after collective bargaining through a local organization of their choice. Clearly those employees have exercised their option to dispense with the benefit of the formal collective bargaining agreement through a labor organization. Just as the Act provides democratic machinery to protect the employees' choice to bargain collectively, so equally it protects the employees' right to forego those benefits, if in their judgment their interests are best served by this course. There has been no evidence of Company hostility toward the union and no evidence that the Company itself interfered with any exercise of employee rights to bargain collectively, unless it might be said that an enlightened personnel policy led them to be content with the status quo. This was their choice. We see no reason under the Act to disturb that choice or to tip the scales against it and in favor of that which the employees themselves have twice rejected.

## II

The Board also found that the Company was guilty of a section 8(a)(1) violation because of the interrogation of certain employees, through PRADCO, in

---

**11.** Our analysis therefore is not altered by the fact that the Company changed the vacation policy following discussions with the committee. An isolated incident does not convert the Committee into a labor organization. *See Mercy-Hospital Corp., supra,* 231 NLRB at 1121; *General Foods, supra,* 231 NLRB at 1235.

the course of the latter's attitude survey.[12] Suffice it to say that there is a total absence of any evidence of actual or intended restraint of employee rights under the Act, even assuming, as we must, that the Board properly credited the testimony of the employees that the interrogation had in fact taken place. Our court has often held that simple interrogation unaccompanied by threats or other forms of coercion does not violate the Act. *See, e.g. Hughes & Hatcher Inc. v. NLRB,* 393 F.2d 557 (6th Cir. 1972); *Lincoln Bearing Company v. NLRB,* 311 F.2d 48 (6th Cir. 1962). An employer has a right to speak with employees so long as an interrogation is not coercive. *Lane Drug Company v. NLRB,* 391 F.2d 812 (6th Cir. 1968). As Judge Phillips observed in *NLRB v. Elias Brothers Big Boy, Inc.,* 325 F.2d 360 (6th Cir. 1963), "[i]nfrequent, isolated and innocuous inquiries of a relatively small number of employees, standing alone, do not constitute interference, restraint or coercion within the meaning of section 8(a)(1) of the Act." *Id.* at 364. *See also NLRB v. Tennessee Coach Company,* 191 F.2d 546 (6th Cir. 1951).

Employees testified only that they were asked if they wished to join the Union because of their complaints.[13] There is no evidence on the record that employees were threatened, nor has a hostile atmosphere tending to inhibit employee choice been shown. The Board points to only one indication of union animus, that being in certain anti-union comments made by Steve Adams, a Company foreman. The use of his statement for these purposes, however, is in complete contradiction to the findings of the ALJ in rejecting that statement as such evidence:

While it is clear that Respondent would rather not recognize and bargain with any independent labor organization, Adams' statement falls short of an expression of corporate intent to thwart employees' exercise of the Section 7 rights by unlawful means. Therefore, it is not an expression of unlawful animus as the General Counsel argues.

249 NLRB No. 54 at 397.

We must view the interrogation "as the employee must have understood the questioning and its ramifications." *Hughes & Hatcher, supra,* 393 F.2d at 563. When the ALJ's observations are considered with the nature of the actual interrogations which took place and which were executed with great restraint, not by the Company but by a professional attitude survey company, it can readily be seen that the probable effect was not to coerce or to deter employees from exercising their rights.

This conclusion is buttressed by the finding that the record as a whole does not reflect that the employees in fact felt inhibited by the statements. Employees testified that questions concerning union attitudes were asked in a relaxed atmosphere in which an air of confidentiality had been not only assured but apparently maintained throughout.[14] A PRADCO interviewer testified that the interviewers deliberately attempted to make employees comfortable to encourage candor. The interviewers did not even know the names of the persons who had been asked until the testimony at the hearing. Under such circumstances, the record altogether fails to provide substantial evidence to support the charges.

Enforcement is denied.

---

12. Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) provides:
   (a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain or coerce employees in the exercise of rights guaranteed in section 157 of this title . . . .

13. See note 3 *supra.*

14. One employee PRADCO questioned about unions testified that the inquiry was not direct-ed to any particular employee and that all employees answered. The Board suggests that some employees were coerced at one meeting because only one employee answered the question; that employee testified that the interviewer asked the question in response to the employee's previous statement that she supported the Union. Another employee testified that employees rather than PRADCO raised the issue of the Union at a third meeting.

COHN, District Judge.

I concur in the result reached in Part II of the panel opinion; I respectfully dissent from Part I. I believe my colleagues give too little weight to the National Labor Relations Board's determination that the In-Plant Representation Committee was a "labor organization" as defined in Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5). *See N.L.R.B. v. Production Molded Plastics, Inc.,* 604 F.2d 451, 453–54 (6th Cir. 1979). My reading of the record supports the Board's conclusion that the committee was a labor organization as defined in Section 2(5) as interpreted by the Supreme Court in *N.L.R.B. v. Cabot Carbon Co.,* 360 U.S. 203 (1959). *See* 249 N.L.R.B. No. 54 (1980).

However much there may be a need for "bona fide, socially desirable employee committee[s] or joint employer-employee committee[s] that [are] something less than a labor organization and something more than a Great Books Study Group", *N.L.R.B. v. Walton Manufacturing Co.,* 289 F.2d 177, 182 (5th Cir. 1961) (Wisdom, J., dissenting in part), that objective should not be achieved by overly restricting the definition of a labor organization. Rather, I believe, the test to be emphasized is employer domination, Section 8(a)(1), (2) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (2). *See Modern Plastics Corp. v. N.L.R.B.,* 379 F.2d 201 (6th Cir. 1967).