986 F.2d 1421
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Matt and Robin KERR, and Debbie Tomaszewski, Plaintiffs-Appellants,
v.
Helen C. VICK and Richard Vick, Defendants-Appellees,
and
Welles-Bowen Realty, Inc. and Gerry Cottey, Defendants.
 No. 92-3272.
 United States Court of Appeals, Sixth Circuit.
 Feb. 19, 1993.
 
 Before MERRITT, Chief Judge, and BOYCE F. MARTIN, Jr. and MILBURN, Circuit Judges.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 Matt and Robin Kerr and Debbie Tomaszewski filed this lawsuit under the Fair Housing Act, 42 U.S.C. § 3601, et seq., and under 42 U.S.C. §§ 1981 and 1982. Their complaint alleged that Helen C. Vick and Richard Vick engaged in discriminatory activity against them in connection with the sale of Helen Vick's house. The Kerrs also named the listing broker, Welles-Bowen Realty, Inc., and the listing agent, Gerry Cottey, as defendants. Ultimately, the Kerrs settled their case and purchased the house from the Vicks. They then filed a motion for attorney's fees against the Vicks. The district court denied the motion, finding that the Kerrs were not the "prevailing party" in their action against the Vicks within the meaning of the Fair Housing Act and 42 U.S.C. § 1988.[1] We reverse.
 
 
 2
 In early 1991, the plaintiffs, Matt and Robin Kerr, began looking for a house to purchase in the Toledo, Ohio area. The Kerrs have different ethnic backgrounds: Matt is Hispanic, and Robin is Caucasian. To help them find a house to purchase, the Kerrs used the services of Debbie Tomaszewski, a licensed realtor and broker. Through the Toledo Board of Realtors' Multiple Listing Service, Tomaszewski learned that property located at 3663 Revere Street in Toledo was for sale, and that the listing price was $34,900. The sellers were the defendants, Helen C. Vick and Richard Vick. Helen Vick was the titleholder, and Richard is her son.
 
 
 3
 The Kerrs drove by the house and liked its appearance. On March 20, 1991, Tomaszewski obtained permission from Welles-Bowen, Inc., the listing broker, to show the property to the Kerrs. Matt Kerr and Tomaszewski viewed the inside of the property, and, based on the inspection, the Kerrs decided to submit an offer to purchase the property. The Kerrs' initial offer was to purchase the house for $29,000, with a 20% downpayment and pre-approved credit. Tomaszewski submitted this offer to the seller's agent, Gerry Cottey, on March 20. This offer was the first that the defendants had received on the property. The Vicks rejected this offer.
 
 
 4
 On March 21, both Matt and Robin Kerr visited the property with Matt's parents. They spoke with the neighbors, then decided to submit an improved offer of $32,000.[2] The Kerrs submitted this figure in writing on the same day. By March 23, the Kerrs had not received a response to this offer. Tomaszewski spoke with Cottey about the status of the offer on the same day. Cottey told Tomaszewski that she had submitted the offer to the Vicks that morning, along with another offer which involved government financing. Cottey had met with the Vicks at the nursing home where Helen Vick resided to present both the Kerrs' offer and the government-financed offer. At the outset of the meeting, Helen Vick asked Cottey if any of the potential buyers were black. In response, Cottey told Mrs. Vick that she did not know the race of the buyers and that the issue of race was irrelevant to the sale. The Vicks asked for time to peruse the offers, and Cottey agreed to contact them later that day. After meeting with the Vicks, Cottey relayed the substance of this conversation, including the inquiry about race, to Tomaszewski. Tomaszewski's affidavit states that Cottey told her during this conversation that Richard Vick had told Cottey that "even $50,000 would not be enough money" for the house if the Kerrs were "the wrong color."
 
 
 5
 During the course of these events, at least one broker showed the house to another potential purchaser, who planned to make an offer. On the evening of March 23, Cottey spoke with Richard Vick, who told her that the Vicks were rejecting the government-financed offer and that they wanted to make some changes to the Kerrs' offer with respect to certain chattels and the closing date. Cottey conveyed the Vicks' verbal counter-offer to Tomaszewski. Shortly thereafter, Cottey received another offer on the property and conveyed it to Richard Vick. Vick thought that this offer was too good to pass up, so Cottey phoned Tomaszewski to determine if the Kerrs would increase their offer. On March 27, Richard Vick told Cottey to negate all verbal counteroffers that he had made to the Kerrs and to tell them that he would sell the house for the original listing price with no chattels. The Vicks returned the Kerrs' $32,000 offer unsigned, and they never submitted a written counteroffer to the Kerrs. Apparently, several other potential buyers were interested in purchasing the property, and brokers continued to show the house.
 
 
 6
 The Kerrs filed suit against the Vicks, Cottey, and Welles-Bowen on March 27, 1991. The Complaint alleged violations of the Fair Housing Act, 42 U.S.C. § 3601 et seq., and 42 U.S.C. §§ 1981 and 1982, based on discriminatory acts and statements in connection with the sale of the property. The Kerrs made the following requests for relief in the Complaint: (1) that the court permanently enjoin the defendants from refusing to sell the house to the plaintiffs; from showing the house to anyone other than the plaintiffs; and from making statements indicating any preference, limitation, or discrimination based on race, color, ancestry, or national origin; (2) that the court issue a temporary restraining order and preliminary injunction restraining the defendants from negotiating for the sale of the property with anyone other than with the plaintiffs; and (3) that the court award compensatory and punitive damages and attorney's fees and costs. At the same time, the plaintiffs filed a motion for a temporary restraining order and preliminary injunction pursuant to 42 U.S.C. § 3613.[3]
 
 
 7
 The district court granted the temporary restraining order on March 27, 1991, finding that, without such restraint, the defendants would sell or would be able to sell the property to someone other than the plaintiffs. In addition, the court found that such a sale would cause irreparable harm to the plaintiffs. During the next two weeks, the parties conducted discovery, deposing all parties except Helen Vick. On April 10, 1991, the district court granted the preliminary injunction. The court, however, limited the injunction to Mrs. Vick because only she could actually sell the property.
 
 
 8
 Shortly after the court issued the preliminary injunction, the parties undertook negotiations for the sale of the property to the Kerrs. The settlement discussions eventually led the Vicks to sell the property to the Kerrs for $32,000. The sale closed on July 12, 1991. Thereafter, the Kerrs voluntarily dismissed their complaint against the Vicks. The Stipulation of Dismissal and Order, dated July 25, 1991 and signed by each party or its representative, contains the following statement: "This Stipulation of Dismissal is not intended to affect or waive any party's right to petition the Court for an award of attorneys fees and costs." The Kerrs filed their motion for award of attorney's fees with the court on August 22, 1991, pursuant to 42 U.S.C. § 3613(c)(2), 42 U.S.C. § 1988, 28 U.S.C. § 1920, and FED.R.CIV.P. 54(d).[4]
 
 
 9
 On March 9, 1992, the district court denied the plaintiffs' motion for attorney's fees. The court held that the circumstances of this case did not warrant an award of fees for two primary reasons: (1) the temporary restraining order and the preliminary injunction represented merely procedural success for the plaintiffs, in that the court granted the motions to maintain the status quo, citing Webster v. Sowders, 846 F.2d 1032, 1036 (6th Cir.1988)[5]; and (2) the terms of the settlement did not make the plaintiffs the "prevailing party" under the test announced in Johnston v. Jago, 691 F.2d 283, 286 (6th Cir.1982). This appeal followed.
 
 
 10
 The Kerrs contend that they were the "prevailing party" in their action against the Vicks. Section 1988[6] provides that the court, in its discretion, may allow an award of attorney's fees to the prevailing party. "[T]hat discretion [,however,] is not without limit: the prevailing party should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Blanchard v. Bergeron, 489 U.S. 87, 89 n. 1 (1989) (quoting Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400 (1968)). Therefore, determining that the plaintiff is the "prevailing party" brings the plaintiff across the statutory threshold warranting some sort of fee award. See Krichinsky v. Knox County Schools, 963 F.2d 847, 850 (6th Cir.1992). The fee award should be reasonable, calculated in light of the degree of the plaintiff's success in comparison to the scope of the litigation as a whole. Hensley v. Eckerhart, 461 U.S. 424 (1983).
 
 
 11
 In Johnston v. Jago, 691 F.2d 283, 286 (6th Cir.1982), this court adopted a two-part test for determining whether a party is the "prevailing party" within the meaning of § 1988 when the parties have settled the lawsuit. The first prong is factual: "a plaintiff must demonstrate that his or her lawsuit was causally related to securing the relief obtained." Id. The second prong is legal: "[a] plaintiff must establish some basis in law for the relief secured." Id. (quoting Nadeau v. Helgemoe, 581 F.2d 275, 281 (1st Cir.1978)). The Johnston court explained this second prong further, stating,
 
 
 12
 If it has been judicially determined that defendants' conduct, however beneficial it may be to plaintiffs' interests, is not required by law, then defendants must be held to have acted gratuitously and plaintiffs have not prevailed in a legal sense.... [T]his inquiry does not entail full trial on the merits. Rather, the trial court need only consider whether the plaintiff's claim is frivolous, unreasonable, or groundless.
 
 
 13
 Id. (quoting Nadeau, 581 F.2d at 281). This test "strikes the proper balance between rewarding the filing of wholly frivolous lawsuits on the one extreme and, on the other extreme, withholding fees unless the plaintiff's claim is fully evaluated on the merits." Id.
 
 
 14
 Applying this test to the facts before it, the Johnston court concluded that the plaintiff was the prevailing party. Id. at 286-87. Therefore, it affirmed the award of fees. Id. The court reasoned that the magistrate, who conducted a hearing on the fees issue, was not clearly erroneous in determining that the plaintiff's lawsuit was causally related to the relief the plaintiff received by settling the lawsuit. Id. at 287. Furthermore, the court concluded that the plaintiff met the second, legal prong of the test, despite various defenses available to the defendant, because the plaintiff's claim was "not patently frivolous." Id.
 
 
 15
 In our opinion, the 1989 decision in Texas State Teachers Ass'n v. Garland Indep. School Dist., 489 U.S. 782 (1989), which reconsidered the meaning of "prevailing party" within the context of § 1988, does not change the analysis of Johnston. In Texas State Teachers, the plaintiffs applied for attorney's fees, but the defendants argued that the plaintiffs had failed to win on a "central issue" of the lawsuit, relying on the test employed by the Fifth Circuit to determine whether a plaintiff is the "prevailing party." See Simien v. San Antonio, 809 F.2d 255, 258 (5th Cir.1987). The court first concluded that the "central issue" test did not comport with the thrust of its decision in Hensley v. Eckerhart, 461 U.S. 424 (1983), in which the court indicated that "the degree of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee, not to the eligibility of a fee award at all." Texas State Teachers, 489 U.S. at 790.
 
 
 16
 Following the analysis in Nadeau v. Helgemoe, 581 F.2d 275 (1st Cir.1978), the Texas State Teachers court adopted a "generous formulation" of the definition of "prevailing party" for cases in which a party achieves only limited success in the litigation. Texas State Teachers, 489 U.S. at 792. The court held that to be a "prevailing party," the plaintiff must meet the following standard:
 
 
 17
 If the plaintiff has succeeded on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit, the plaintiff has crossed the threshold to a fee award of some kind.... Thus, at a minimum, to be considered a prevailing party within the meaning of § 1988, the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant. Id. at 791-92 (citations omitted).
 
 
 18
 The court, however, qualified this test, stating, "[w]here the plaintiff's success on a legal claim can be characterized as purely technical or de minimis, a district court would be justified in concluding that even the 'generous formulation' we adopt today has not been satisfied." Id. at 792 (citations omitted). Finally, the court emphasized, "the touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." Id.
 
 
 19
 The Kerrs contend that Texas State Teachers is the correct standard by which a district court should analyze entitlement to fees. Relying on the "alteration of the legal relationship" language, the Kerrs argue that Texas State Teachers has changed the prevailing party analysis to the extent that our decision in Johnston no longer governs the determination of whether the plaintiff is the "prevailing party." We disagree. The "prevailing party" standards of Johnston and Texas State Teachers are entirely consistent with each other; therefore, we will continue to evaluate whether a plaintiff who has settled its lawsuit is a "prevailing party" under the test we announced in Johnston v. Jago, 691 F.2d 293 (6th Cir.1982).
 
 
 20
 In Texas State Teachers, the Supreme Court attempted to strike the same balance struck by this court in Johnston: that between awarding fees for totally frivolous lawsuits and between denying fees without a full evaluation of the plaintiff's claims on the merits. See Johnston, 691 F.2d at 286; Texas State Teachers, 489 U.S. at 792-93. In fact, Texas State Teachers relies heavily on the language and policy reflected in Nadeau v. Helgemoe, 581 F.2d 275 (1st Cir.1978), which this court followed in Johnston. Texas State Teachers requires that "the plaintiff ... be able to point to a resolution [of the lawsuit] which changes the legal relationship between itself and the defendant." Texas State Teachers, 489 U.S. at 792 (emphasis added). Given the argument advanced by the Kerrs, this language clearly gives rise to two very different interpretations. Any resolution of a lawsuit by a settlement inevitably changes the legal relationship between the parties by requiring one party to act or to refrain from acting in a particular manner. We believe that the Texas State Teachers court, given its policy concerns, intended that the lawsuit itself, rather than the resolution of that lawsuit, be the impetus that changes the legal relationship between the parties. The Johnston test articulates precisely what must produce the change in the legal relationship between the parties: the lawsuit.
 
 
 21
 The most recent decision on the issue of a prevailing party's entitlement to attorney's fees, Farrar v. Hobby, 61 U.S.L.W. 4033 (U.S. Dec. 14, 1992), bolsters our conclusion that the standards articulated in Johnston and Texas State Teachers are consistent. In Farrar, the court considered whether a plaintiff who wins only nominal damages is entitled to receive attorney's fees as the "prevailing party." Holding that even nominal relief may warrant an award of fees, the court reaffirmed its holding in Texas State Teachers and stated, "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." Id. at 4036. The court explained that unless the relief obtained directly benefits the plaintiff at the time of the judgment or settlement, "the judgment or settlement cannot be said to affect the behavior of the defendant toward the plaintiff." Id. (citations omitted). This standard would be anomalous without a requirement that the lawsuit effect the material alteration of the legal relationship between the parties. Therefore, this court will continue to adhere to the test developed in Johnston v. Jago, 691 F.2d 293, 296 (6th Cir.1982), because we believe that it conforms with the holding and analysis contained in both Texas State Teachers Ass'n v. Garland Indep. School Dist., 489 U.S. 782 (1989) and Farrar v. Hobby, 61 U.S.L.W. 4033 (U.S. Dec. 14, 1992). Thus, if the lawsuit itself causes the legal relationship between the parties to change, for example, by a settlement, then the plaintiff is the "prevailing party" for purposes of the fees issue.
 
 
 22
 After examining the facts of this case in light of the Johnston standard, we hold that the district court incorrectly applied the Johnston standard, and that the Kerrs were the "prevailing party" in their suit against the Vicks. The first prong of Johnston requires a factual determination that the plaintiff's lawsuit was causally related to securing the relief obtained. Johnston, 691 F.2d at 286. The district court's finding that no causal relationship existed between the Kerrs' lawsuit and the ultimate resolution of the lawsuit is clearly erroneous. The Kerrs sought primarily injunctive relief against the Vicks to prevent the Vicks from selling the house to another buyer until the parties could negotiate for the sale without reference to the issue of race or national origin. Evidence in the record demonstrates that the Vicks had many inquiries about the house from other potential sellers; that they desired to sell the house quickly; and that, absent preliminary injunctive relief, the Vicks likely would have sold the house to another person. Evidence also supports the Kerrs' allegation of discrimination. A causal relationship certainly exists between the lawsuit and the renewed negotiations between the parties for the sale of the house. Moreover, the plaintiffs ultimately obtained their primary objective in the litigation by purchasing the house. Therefore, the plaintiffs meet the first prong of the Johnston test because the lawsuit was causally related to the outcome of the case.
 
 
 23
 The second part of the Johnston analysis requires the court only to consider whether the plaintiff's claim is "frivolous, unreasonable, or groundless." Id. The district court erroneously concluded that the Kerrs' lawsuit was groundless. The Fair Housing Act makes statements which indicate "any preference, limitation, or discrimination based on race, color, ... or national origin...." in connection with the sale of property unlawful. 42 U.S.C. § 3604(c). Furthermore, the district court may grant injunctive relief if it finds that a discriminatory act which would violate the Fair Housing Act has occurred or is about to occur. 42 U.S.C. § 3613(c)(1). The record supports the plaintiffs' allegation that the Vicks made discriminatory statements; therefore, we cannot say as a matter of law that the plaintiffs' claims were baseless. Thus, the plaintiffs have satisfied the second prong of Johnston. As such, the Kerrs satisfy the "prevailing party" standard of Johnston, and they are entitled to an award of reasonable attorney's fees.
 
 
 24
 Accordingly, the judgment of the district court is reversed and the case is remanded with instruction that the court award reasonable attorney's fees to the Kerrs as the prevailing party in this litigation, in accordance with the guidelines established in Hensley v. Eckerhart, 461 U.S. 424 (1983) and in Farrar v. Hobby, 61 U.S.L.W. 4033 (U.S. Dec. 14, 1992).
 
 
 
 [1]
 The plaintiffs entered separate settlement agreements with both Welles-Bowen and Gerry Cottey which addressed the issue of attorney's fees. Therefore, whether Welles-Bowen or Cottey owe the Kerrs attorney's fees is not an issue before this court
 
 
 [2]
 The remaining terms of this offer are unclear. The Vicks are proceeding in this action pro se, and their brief seems to indicate that this offer also contained stipulations that the Vicks convey certain chattels to the Kerrs for the same purchase price. Cottey's deposition also indicates that the Kerrs wanted the Vicks to convey certain chattels with the property
 
 
 [3]
 42 U.S.C. § 3613(c)(1) provides,
 In a civil action under subsection (a) of this section, if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d) of this section, may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).
 
 
 [4]
 The fees provisions relied upon by the plaintiffs under the Fair Housing Act and the Civil Rights Act provide, in pertinent part,
 42 U.S.C. § 3613(c)(2): In a civil action under subsection (a) of this section, the court, in its discretion may allow the prevailing party ... a reasonable attorney's fee and costs....
 42 U.S.C. § 1988: ... In any action or proceeding to enforce a provision of sections 1981, 1982 ..., the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs.
 
 
 [5]
 Because this case ended in a settlement, the portion of Webster v. Sowders, 846 F.2d 1032 (6th Cir.1988), concerning whether a preliminary injunction warrants an interim grant of attorney's fees does not apply to the analysis of the fees issue in this case. Thus, our analysis will center on the propriety of awarding attorney's fees when the case settles, as opposed to eligibility for fees when the court has granted interim injunctive relief
 
 
 [6]
 The plaintiffs moved that the district court grant attorney's fees pursuant to 42 U.S.C. § 3613(c)(2) and 42 U.S.C. § 1988. Both statutes permit the court to grant fees to a "prevailing party." The definitions section of the Fair Housing Act, 42 U.S.C. § 3602(o), provides, " '[p]revailing party' has the same meaning as such term has in section 1988 of this title." Therefore, to determine if the Kerrs were the "prevailing party" in the underlying action, this court will examine cases construing the meaning of that term under section 1988, in addition to other similarly-worded statutes